THE HONORABLE RICARDO S. MARTINEZ

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT SEATTLE

10   STEAMSHIP MUTUAL UNDERWRITING
     ASSOCIATION LIMITED, a foreign limited
11   liability corporation,                           Case No.: 15-cv-00043-RSM

12                  Plaintiff,                        **DECLARATION OF RICHARD F.
                                                      ALLEN IN SUPPORT OF
13           v.                                       DEFENDANT OSPREY
                                                      UNDERWRITING AGENCY
14   OSPREY UNDERWRITING AGENCY                       LIMITED AND CERTAIN
     LIMITED, AND ITS CERTAIN                         UNDERWRITERS' MOTION TO
15   UNDERWRITERS, a foreign unincorporated           DISMISS PURSUANT TO FRCP
     entity and/or corporation; and AMERICAN          12(b)(6)**
16   STEAMSHIP OWNERS MUTUAL
     PROTECTION AND INDEMNITY                         **NOTE ON MOTION CALENDAR:**
17   ASSOCIATION, INC., believed to be a New
     York corporation,                                **February 12, 2016**
18
                    Defendants.
19

20           I, Richard F. Allen, declare and state as follows:

21           1.      I am over the age of 18 and am competent to testify to the matters set forth

22   herein.

23           2.      I am an attorney with the law firm of Cozen O'Connor in Seattle, Washington,

24   attorneys of record for Defendant Osprey Underwriting Agency Limited, and its Certain

25   Underwriters ("Osprey").  I have personal knowledge of the matters contained in this

26
     DECLARATION OF RICHARD F. ALLEN IN SUPPORT OF           LAW OFFICES OF
     OSPREY'S MOTION TO DISMISS - 1                          **COZEN O'CONNOR**
     Case No.: 15-CV-00043-RSM                           A PROFESSIONAL CORPORATION
                                                              999 THIRD AVENUE
                                                                  SUITE 1900
                                                            WELLS FARGO CENTER
                                                        SEATTLE, WASHINGTON 98104
                                                               (206) 340-1000

declaration.  I submit this declaration in support of Osprey's Motion to Dismiss Pursuant to FRCP 12(B)(6).

3.      Attached hereto as **Exhibit A** is a true and correct copy of the Mediated Settlement Agreement between Plaintiff Steamship Mauricio Sanchez and Shelford Boat Inc. dated November 4, 2014, and produced to Osprey Underwriting by Plaintiff Steamship on March 15, 2015 in the collateral proceeding between Osprey and Steamship in The High Court of Justice, Queen's Bench Division in London, England.

4.      Attached hereto as **Exhibit B** is a true and correct copy of the Osprey policy issued to Shelford Boat Inc.

5.      Attached hereto as **Exhibit C** is a true and correct copy of *AstraZeneca Ins. Co. Ltd. v. XL Ins. Ltd.*, [2013] EWCA (Civ) 1660 (Eng.).

6.      Attached hereto as **Exhibit D** is a true and correct copy of the Findings of Fact and Conclusions of Law entered by Judge John C. Coughenour in Case No. C11-2001-JCC styled *Paul Aaron Savchenko, Plaintiff, v. Icicle Seafoods, Defendant, and Icicle Seafoods and L.F.K. Fisheries, Third-Party Plaintiffs v. Kari Marie Fisheries LLC and Mark Hjelle, Third-Party Defendants*, on October 31, 2013.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED at Seattle, Washington this 20th day of January, 2016.


By:    */s/ Richard F. Allen*
        Richard F. Allen

DECLARATION OF RICHARD F. ALLEN IN SUPPORT OF
OSPREY'S MOTION TO DISMISS - 2
Case No.: 15-CV-00043-RSM

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
WELLS FARGO CENTER
SEATTLE, WASHINGTON 98104
(206) 340-1000

1

## CERTIFICATE OF SERVICE

2

I, Suzy A. Miller, certify and state as follows:

3

I am a citizen of the United States and a resident of the State of Washington; I am over the

4

age of 18 years and not a party of the within entitled cause.  I am employed by the law firm of

5

Cozen O'Connor, 999 Third Avenue, Suite 1900, Seattle, WA 98104.

6

I hereby certify that on this 20th day of January, 2016, I electronically filed the

7

foregoing *Declaration of Richard F. Allen in Support of Defendant Osprey Underwriting*

8

*Agency Limited and Certain Underwriters' Motion to Dismiss Pursuant to FRCP 12(b)(6),* and

9

Exhibits attached thereto, with the Clerk of the Court using the CM/ECF system which will

10

send notification of such filing to the following:

11

*Attorneys for Plaintiff:*
John E.D. Powell, WSBA #12941

12

Jed Powell & Associates, PLLC
7525 Pioneer Way, Suite 101

13

Gig Harbor, WA 98335
PH:     253-561-8791/ FX:     253-561-8791

14

Email:  jed@jedpowell.com

15

*Attorneys for Defendant American Steamship Owners Mutual Protection and Indemnity Association:*

16

Christopher W. Nicoll, WSBA #20771
William A. Pelandini, WSBA #11521

17

Nicoll Black & Feig
1325 Fourth Avenue, Suite 1650

18

Seattle, WA  98101
PH:     206.838.7555 / FX:  206.838.7515

19

E-mail:  cnicoll@nicollblack.com
           wpelandini@nicollblack.com

20

I hereby declare under oath and under the penalty of perjury of the laws of the State of

21

Washington that the foregoing is true and correct.

22

DATED this 20th day of January, 2016.

23

24

COZEN O'CONNOR

*/s/ Suzy A. Miller*

25

Suzy A. Miller, Senior Legal Assistant

26

LEGAL\25457442\1 00650.3227.000/355998.000

DECLARATION OF RICHARD F. ALLEN IN SUPPORT OF
OSPREY'S MOTION TO DISMISS - 3
Case No.: 15-CV-00043-RSM

LAW OFFICES OF
**COZEN O'CONNOR**
A PROFESSIONAL CORPORATION
999 THIRD AVENUE
SUITE 1900
WELLS FARGO CENTER
SEATTLE, WASHINGTON 98104
(206) 340-1000

*EXHIBIT A*
*TO DECLARATION OF*
*RICHARD F. ALLEN IN SUPPORT*
*OF OSPREY'S MOTION TO DISMISS*

*CR 2A*   **MEDIATED SETTLEMENT AGREEMENT**

Date: November 4, 2014

The undersigned parties hereby enter into this binding CR 2A agreement ("Agreement") to settle and fully release any and all claims of Mauricio Sanchez ("Releasor") against Shelford's Boat Ltd., Shelford Ventures, LLC, Shelford Fisheries, LLC, RSD Fisheries, LLC, Shelford Investments, LLC, their agents, their owners, their directors, their principals, their employees, and their insurers including, but not limited to, Steamship Mutual Protection and Indemnity Club and its managers, Osprey Underwriting Agency Limited and The American Club ("Releasees"), for any and all injuries and/or all damages arising out of injuries and/or incidents that allegedly occurred at any time before November 4, 2014. In exchange for a complete release and dismissal of all of Releasor's claims, Releasor will receive the total sum of $ *300,000 New Money* Payment shall be made to the Trust Account of Anthony M. Urie, PLLC not later than 21 days after execution of the final settlement documents. This Agreement is not and shall not be considered an admission of liability by Releasees. Releasor shall keep confidential this Agreement. Nothing in this Agreement shall in any way serve to release any claims, positions, or causes of action (contractual or extra-contractual) that Shelford's Boat Ltd., Shelford Ventures, LLC, Shelford Fisheries, LLC, RSD Fisheries, LLC, and/or Shelford Investments, LLC, have or may have against Osprey Underwriting Agency Limited and The American Club.

Releasor and his attorney agree to be responsible to satisfy all liens and any outstanding subrogation claims, to execute an appropriate Full and Final Release and Settlement of All Claims, with a covenant to defend, indemnify, and hold harmless Releasees from all third-party claims arising out of or releasing to the alleged injuries, incidents, and/or released claims, with a confidentiality covenant, and with confirming documents, and to enter an order of dismissal of all claims with prejudice, without attorney fees, and without costs in Snohomish County Superior Court, Case No.: 13-2-04513-1. Mr. Markovich shall prepare the final settlement documents to be approved by Mr. Urie and signed by Mr. Sanchez. Any disputes as to or arising from this Agreement or the above-referenced final settlement documents shall be resolved by Teresa Wakeen, as the final binding arbitrator, *Defense will be pay mediation costs.*

Mauricio Sanchez

Anthony E. Urie, Attorney for Mauricio Sanchez
Releasor's Law Firm Tax ID Number: *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*

Shelford's Boat Ltd.,
by Mike Shelford, its Vice President

{02681891.DOCX;1 } 1 — MEDIATED SETTLEMENT AGREEMENT
PDX\078793\190961\BWM\14872627.1

RECEIVED

NOV - 7 2014

Schwabe Williamson
& Wyatt

## RECEIPT AND RELEASE

KNOW ALL MEN THESE PRESENTS:

That the undersigned, MAURICIO SANCHEZ ("RELEASOR"), for and in sole consideration of the sum of Three Hundred Thousand and No/100 Dollars ($300,000), in addition to settlement advances of $7,782.86 which have been previously received, does hereby release, discharge and forever acquit the vessel ALEUTIAN LADY, Shelford's Boat Ltd., Shelford Ventures, LLC, Shelford Fisheries, LLC, RSD Fisheries, LLC, Shelford Investments, LLC, owners and operators of the vessel ALEUTIAN LADY, officers, directors, principals, crew members, claims representatives, agents, attorneys, and their insurers including, but not limited to, Steamship Mutual Protection and Indemnity Club and its managers, Osprey Underwriting Agency Limited and The American Club of said vessel and above entities and any other vessels owned or operated by Released Parties ("Released Parties") and any and all other persons, firms, corporations or entities having any interest in or connection with the incidents or work which caused RELEASOR to sustain injury, and all other persons, firms or corporations liable or who might be claimed to be liable, and each and all of them, of and from any and all claims of whatsoever nature at law, in equity, or in admiralty, for any and all loss, damage or injury arising out of or in any way connected with any injuries, disabilities and/or illnesses sustained by RELEASOR while employed aboard the ALEUTIAN LADY or any other vessel owned or operated by Released Parties and/or while working for Released Parties from the beginning of the world to the date of these presents, including, but not limited to the following serious injuries: low back injury with herniated discs of the low back which resulted in three surgeries (including a microdiskectomy and two spinal fusions with placement of hardware and a metal cage), and other medical treatment which cost approximately $235,000 (which was paid as cure), and other problems documented in Releasor's medical records (March, 2011 – present) as a result of incidents which occurred when RELEASOR

PDX\078793\190961\DWM\14883702.1

6

was employed aboard the ALEUTIAN LADY and/or other vessels owned by Released Parties and/or as a result of his employment with any Released Party.

This release is intended to release all claims that RELEASOR claims that he has against any of the released parties including, but not limited to, claims for maintenance and cure, and all personal injury claims and compensatory and/or punitive damages of RELEASOR as a result of incidents that occured as a result of his employment with any Released Party. RELEASOR hereby releases any and all claims that he has alleged or could have alleged in a complaint filed in Snohomish County Superior Court in Everett, Washington, Cause No. 13-2-04513-1, and any and all other claims that RELEASOR has or might assert as a result of his employment with any of the Released Parties, including but not limited to, any claims for special damages, general damages, punitive damages, or attorney fees.

In particular, but without prejudice to the generality of the foregoing, the undersigned acknowledges that in making this settlement RELEASOR fully understands the following:

(1)      That he has sustained the following injuries:  serious injuries to his low back which have resulted in three lumbar surgeries and implementation of a metal cage and hardware, and other problems documented in Releasor's medical records (including, but not limited to, problems with his shoulders, wrists, upper extremities, knees) from which he is not now completely recovered, and which have resulted in permanent disability.

(2)      That as a result of the aforesaid injuries RELEASOR required medical treatment, and will require future medical treatments, including, but not limited to, possible future surgeries.

(3)      That immediately prior to RELEASOR'S injury, he was capable of earning and was in fact earning income in his occupation. That RELEASOR has been disabled from returning to

FDX\07879\190961\BWM\14283702.1

- 2 -

work. That as a result thereof RELASOR has lost substantial earnings, and he realizes he will lose substantial earnings in the future as a result of said injuries.

(4)     That by signing this release RELEASOR is releasing and discharging any and all claims against the Released Parties which he now has or which may hereafter arise as a result of said accident or said employment relationship with any of the Released Parties, including, but not limited to, any claims pursuant to the Alaska State Worker's Compensation Act or related to the payment of maintenance and cure, the administration of his claim, or labor/employment-related claims he may have against any Released Parties, or any other tort, contractual, common law or statutory claims.

(5)     That no promise or agreement not herein expressed has been made to the RELEASOR undersigned and in executing this release RELEASOR is not relying upon any statement or representation made to him by the parties released hereby or by anyone who has acted for them or on their behalf, but he is relying solely upon his own judgment and that of his attorney.

(6)     That the RELEASOR'S attorney, Anthony E. Urie, has carefully explained to RELEASOR the questions which would be involved in the event this matter proceeded to trial, and RELEASOR understands fully that if the matter were to be tried before a jury or a court, the disputed medical question and the dispute in the facts regarding the alleged incidents and occurrences would have to be settled by a jury or court. Further, RELEASOR understands that it is impossible to predict how such dispute would have been decided by a jury or a court and in signing this Release RELEASOR understands that this settlement is mutual, final and binding on all parties hereto, and he is giving up forever the right to receive more; that is, RELEASOR understands that any dispute he has with any of the Released Parties is completely ended by the signing of this Release regardless of whether too much or too little has been paid.

PDX\078793\190961\BWM\14883701.1

- 3 -

(7)    That this full and final Release is intended to cover any and all future injuries, illnesses or diseases arising out of the aforementioned incidents/occurrences or employment with any Released Party not now known to any party hereto, but which may later develop or be discovered, including the effects or consequences thereof and including all causes of action therefore;

(8)    That the parties released herein deny all liability in connection with this matter and this full and final settlement thereof shall never be treated as an admission of liability at any time or in any manner whatsoever.

(9)    That this is a full settlement and satisfaction as to the Released Parties for any and all loss, damages, injury or illness whatsoever sustained by RELEASOR while employed by any Released Party, whether the same be now known to RELEASOR or which may hereafter arise, develop or be hereafter discovered.

(10)   That RELEASOR acknowledges that he has consulted an attorney and has been fully informed of his legal rights, including the right to institute suit for damages and that, in fact, a lawsuit has been commenced in the Snohomish County Superior Court in Everett, WA, being Cause No. 13-2-04513-1, and that in further consideration of said settlement payment does hereby agree to dismiss with prejudice and without costs the above-described suit.

(11)   That this Release includes a release of all claims for medical, surgical or hospital expenses which have been incurred by RELEASOR on account of the said injuries to RELEASOR, and all claims for maintenance, cure, unearned wages or any other remedies under the Jones Act, general maritime law, LHWCA, and/or the Alaska State Worker's Compensation Act. If necessary, and/or applicable, RELEASOR agrees to approve a settlement and sign a Settlement Agreement and/or Dismissal Order pertaining to any possible Alaska State Worker's Compensation claim,

PDX\078793\190961\BWM\14883702.1

- 4 -

pertaining to his injuries and subsequent treatment.  RELEASOR agrees that he will pay for all future medical treatment from the proceeds of this settlement and pay, satisfy, or resolve all unpaid lien claims, and will indemnify and hold harmless the Released Parties from the claims of any third party asserting a claim on the settlement proceeds.

(12)    That RELEASOR acknowledges that this release constitutes a waiver and discharge of all future claims as well as all present claims on account of the matters herein set forth, both on his account and on account of his dependents, heirs, executors, administrators and assigns, including all past, present and future mental, nervous, emotional and physical, partial and total, temporary and permanent disabilities, and injuries to all parts of the person and body, resulting in any degree whatever from or connected with the conditions of the body and mind of RELEASOR claimed to have resulted from injuries or illnesses on said vessels, regardless of whether he does or does not presently anticipate such occurrences or conditions and of whether such occurrences or conditions also result in part from any traumatic injury hereafter.  This Release is given in contemplation of the possible necessity for or occurrence of surgery, hospitalization, medical or nursing attention, out-patient treatment and present or future injuries, illnesses, limitations and disability, functional, nervous, emotional and organic disorders or disability, incompetency and death and all other consequences, proximate or remote, that may follow from such accidents, illnesses, injuries, aggravation and disabilities and from the present or other condition of body and mind.

(13)    That RELEASOR acknowledges that he is signing this release because he is receiving the money aforesaid, and he is not forced to do so by any person or circumstances.  The undersigned acknowledges that he has not been promised anything that is not set forth in this document.

(14)   Confidentiality: RELEASOR, and his attorney, Anthony E. Urie, agree that the terms and conditions and the names of the vessels and Released Parties, attorneys and claims representatives contained herein shall remain confidential forever and shall not be disclosed by them except as necessary to effectuate its terms, except when compelled by legal process; provided, however, that RELEASOR may disclose the terms and conditions herein to his legal and/or accounting advisors, so long as said advisors are advised of the existence of this confidentiality provision and agree to be equally bound by its terms.

(15)   That RELEASOR specifically acknowledges that he is no longer employed by any Released Party and that he was an "at will" employee when he worked for any Released Party, and he has not been promised any future employment or other consideration by the Released Parties, and he does not expect to obtain any such future employment.

(16)   RELEASOR represents and warrants that all subrogation and lien claims arising out of contract or under state or federal law, including but not limited to, any subrogation or lien claims of RELEASOR'S healthcare providers, insurance carriers, the Department of Labor and Industries, the Department of Social and Health Services, and any federal agency or programs such as Medicare, Medicaid, Veterans Administration or federal workers' compensation program, are the sole and separate obligation of the RELEASOR which the RELEASOR agrees to pay or otherwise resolve. RELEASOR represents and warrants that it has had the opportunity to review any and all applicable statutes and regulations concerning Medicare/Medicaid's and/or CMS' interest in this matter, including, but not limited to, 42 U.S.C. § 1395y(b)(2), 42 CFR §§ 411.24(e) and (g-i), as well as § 411.26. The RELEASOR acknowledges and understands that because RELEASOR may have been or in the future might be a Medicare/Medicaid beneficiary, it is his duty to consider and protect the interests of the Centers for Medicare and Medicaid

PDX\078793\190961\BWM\14883702.1

- 6 -

Services (hereinafter "CMS") in this settlement.  To that end, and in compliance with the applicable Federal regulations and the RELEASOR'S duty, the RELEASOR expressly agrees to satisfy any and all CMS/Medicare/Medicaid subrogation interests, claims and/or liens, as may be finally determined and/or compromised, from the RELEASOR.  The RELEASOR further agrees to forever save, defend, indemnify and hold harmless RELEASED PARTIES, their administrators, executors, employees, agents (actual or apparent), servants, affiliates, subsidiaries, parents, insurers and/or self-insured indemnity providers, predecessors, successors and assigns in interest from any and all liens, subrogation interests, claims, demands, action or causes of action for contribution and/or indemnity and judgments for medical treatment or care provided to RELEASOR for any related injury or condition that may be asserted by any third party lien or interest holder.  The RELEASOR waives any claim for damages, including a private cause of action provided in the Medicare/Medicaid statutes, 42 U.S.C. § 1395y(b)(3)(A), for any failure to protect Medicare/Medicaid's interest.

(17)   RELEASOR agrees that the attached CR 2A Agreement is hereby incorporated into this Receipt and Release so that it is a part of this document.  If there is a conflict between the Receipt and Release and the CR 2A Agreement, it is not intentional, and the terms of the Receipt and Release shall prevail over the CR 2A Agreement.

DATED this 04 day of November, 2014.

MAURICIO SANCHEZ

TO BE FILLED IN BY MAURICIO SANCHEZ IN HIS OWN HANDWRITING:

A.   Have you read this paper from beginning to end or has it been read to you?
     _____*Yes*_____ (Yes or No)

B.   Do you know what this paper is that you are signing?
     _____*Yes*_____ (Yes or No)

C.   What is this paper you are signing?

     *Release of everything*
     (Write above this line: Release of everything)

D.   Do you fully understand the meaning and effect of all the terms of this Release?
     _____*Yes*_____ (Yes or No)

Therefore, I am signing my name above the words, THIS IS A RELEASE OF ALL CLAIMS to show that I mean everything that is written in this release or document.

DATED this 24 day of November, 2014.

_____
MAURICIO SANCHEZ
THIS IS A RELEASE OF ALL CLAIMS

STATE OF WASHINGTON )
                     ) ss.
COUNTY OF _King_ )

       On this day personally appeared before me MAURICIO SANCHEZ known to me to be the individual in and who executed the within and foregoing instrument and acknowledged that he signed the same as his free and voluntary act and deed for the uses and purposes therein mentioned.

       GIVEN UNDER MY HAND AND OFFICIAL SEAL this 5th day of November, 2014.

Notary Public in and for the State of Washington
Residing at _SEATTLE, WA._
My commission expires: _8/29/16_
Printed Name: _Patrick Paul Browne_

-9-

## ATTORNEY'S ACKNOWLEDGEMENT

The undersigned attorney for MAURICIO SANCHEZ in connection with the matters and things set forth in the foregoing Release, hereby:

1. Acknowledges that he has read and explained the foregoing Release to MAURICIO SANCHEZ and MAURICIO SANCHEZ has told him that he fully understands the terms and implications of the Release and approves of the settlement. MAURICIO SANCHEZ has told him that he understands that by accepting the settlement of $300,000 he knows he is giving up any and all claims he has against the Released Parties.

2. Acknowledges that the signature to this Release is the signature of MAURICIO SANCHEZ and that the MAURICIO SANCHEZ, who is a signatory hereto, has told him that he is the individual who was injured as described in this Release.

3. Acknowledges that he has explained to MAURICIO SANCHEZ that any and all unpaid hospital bills, doctor bills and/or other medical expenses (which are not part of Released Parties' Cure obligation) or liens of record incurred by or on behalf of MAURICIO SANCHEZ as a result of the injuries described herein will be paid, satisfied, or resolved from the proceeds of this settlement. MAURICIO SANCHEZ has told him that he fully understands and agrees to this.

4. Agrees that he and his firm will be bound by the confidentiality provision of this release.

DATED at Seattle, Washington this _____ day of November, 2014.


By: Anthony E. Urie.
Attorney for MAURICIO SANCHEZ

*EXHIBIT B*
*TO DECLARATION OF*
*RICHARD F. ALLEN IN SUPPORT*
*OF OSPREY'S MOTION TO DISMISS*

# Price Forbes & Partners Limited

*607 PRF7 248*

## UNIQUE MARKET REFERENCE: B0507 M12PP01640

### Risk Details

| | |
|---|---|
| TYPE: | Protection & Indemnity Insurance |
| ASSURED: | Shelford's Boat Ltd and as per Schedule attached<br>5303 Shilshole Avenue NW, Seattle, Washington 98107-4000<br>Including subsidiary and/or affiliated and/or associated and/or partnership companies and/or individual assureds as their respective interests may appear. |
| VESSEL: | F/V "Aleutian Lady" and as per Schedule attached<br>Including new and/or added and/or acquired and/or chartered and/or managed vessels automatically held covered at premium to be agreed by Underwriters. |
| PERIOD: | Attaching: Noon 20th February 2012 Greenwich Mean Time<br>Expiring:  Noon 20th February 2013 Greenwich Mean Time |
| INTEREST: | Protection & Indemnity |
| LIMIT OF LIABILITY: | USD 1,000,000 any one accident or occurrence arising from the same event combined single limit. |
| DEDUCTIBLE: | USD 10,000 all claims any one accident or occurrence. |
| ORDER HEREON: | 100% of 100% |
| TRADING LIMITS: | Bering Sea and West Coast of the United States and Alaskan waters or held covered at a premium to be agreed by Leading Underwriters. |
| CONDITIONS: | Protection and Indemnity Risks subject to SP23 (Rev 1/56).<br>Including Fixed and Floating Objects.<br>Claims Notification Clause (20.2.92).<br>Excess Collision & Towers Liability Clause (01.04.96), amended to Excess of Hull Values.<br>Osprey Fishing Vessel Clauses (20.02.92) with Clause 5(a) and 5(b) deleted.<br>Osprey Restricted Pollution Coverage Wording (01.07.92).<br>Blanket Additional Assureds and Waivers of Subrogation Clause.<br>Automatic Acquisition Clause (15.04.91).<br>Institute Radioactive Contamination, Chemical, Biological, Bio-Chemical and Electromagnetic Weapons Exclusion Clause Cl.370 (10.11.03).<br>Osprey Terrorism and Malicious Acts Exclusion Clause (18.09.01).<br>Excluding Workers Compensation and U.S.A. Longshoremen and harbour Workers Act.<br>Sanction Limitation and Exclusion Clause JH2010/009 (29th July 2010)<br>Agree Polaris to act as Adjuster in respect of any claim arising hereunder or as agreed by Osprey.<br>U.S. Terrorism Risk Insurance Act of 2002 as amended Not Purchased Clause LMA 5092 (21/12/2007). |





JWR
26-Feb-12

8

## Price Forbes & Partners Limited

**507 PRF**

UNIQUE MARKET REFERENCE: B0507 **M12PP01640**

---

**EXPRESS WARRANTIES:** None

*(Other than those that may be expressly contained within the policy conditions, wordings, clauses and in addition to any implied warranties under the law to which this insurance is subject – failure to comply with a warranty will, in normal circumstances, void this insurance policy.)*

**SUBJECTIVITIES:** Subject to completed and signed Protection & Indemnity Application Form, received within 30 days of Inception.

*Between inception and the date for complying with the subjectivity/subjectivities, cover is provided by underwriters on the terms and conditions specified in the in the Risk Details Section.*

*In the event that the insured fails to comply with the subjectivity/subjectivities by the date specified, the insurers shall be entitled vary the conditions or to terminate this contract by giving not less than fourteen days' notice in writing to the insured at their address shown in the contract. In the event of such termination, the insured shall be entitled to pro rata return of premium for the unexpired period of the contract unless a loss has arisen for which the insured seeks indemnity under this contract in which case the insurers shall remain entitled to the full premium specified in the Risk Details Section.*

*To the extent that this subjectivity provision conflicts with any other cancellation, notice and premium provision in the Risk Details Section, this subjectivity provision shall prevail.*

**CHOICE OF LAW & JURISDICTION:** Any dispute concerning the interpretation of this Policy shall be governed by the law and Jurisdiction of England and Wales in accordance with the Osprey Law and Practice Clause. Osprey Service of Suit Clause (01.04.96).

**PREMIUM:** USD 177,975 in full per annum.

**PAYMENT TERMS:** Premium payable to Osprey Underwriting Agency Limited within 60 days from Inception. Osprey Premium Payment Clause as attached
Brokers and/or Agents Cancellation Clause 507PRF00152

**TAXES PAYABLE BY INSURED AND ADMINISTERED BY UNDERWRITERS:** None

**RECORDING, TRANSMITTING & STORING INFORMATION:** Where the broker maintains risk and/or claim data/information/documents the broker may hold such data/information/documents electronically.

**DOCUMENTATION PRODUCTION:** Evidence of Cover to be provided by Price Forbes & Partners Limited in the form of a complete and accurate copy of the Placing Slip.

**CLAIMS AGREEMENT PARTIES:** Osprey Underwriting Agency Limited





JWR
16-Feb-12

9

## Price Forbes & Partners Limited

**507 PRF**

### UNIQUE MARKET REFERENCE: B0507 M12PP01640

COMPLAINT:      All complaints by the Assured must be referred in the first instance to
                Osprey Underwriting Agency Limited
                Fountain House, 8th Floor, 150 Fenchurch Street, London EC3R 5DJ
                (Telephone: +44(0) 20 7283 1227)
                If no satisfaction is obtained, complaints should be referred to the
                Complaints and Advisory Department
                Lloyds, One Lime Street, London EC3M 7HA
                (Telephone: +44(0) 20 7327 1000)

### Information

Vessel Details, Crew Numbers and Anticipated Operations as per Schedule attached.

JWR
16-Feb-12

10

## Price Forbes & Partners Limited         **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640



### (RE)INSURERS LIABILITY CLAUSE
LMA3333 21 June 2007

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.



JWR
16-Feb-12

11

## Price Forbes & Partners Limited                    **507 PRF**

### UNIQUE MARKET REFERENCE: B0507 M12PP01640

SUBSCRIBING INSURERS:

| SYNDICATE | SYNDICATE NUMBER | |
|-----------|------------------|--------|
| SJC | 2003 | 29.00% |
| BRT | 2987 | 15.50% |
| AUW | 609 | 14.25% |
| AGM | 2488 | 7.75% |
| AES | 1225 | 8.50% |
| ASP | 4711 | 6.50% |
| ARG | 2121 | 5.00% |
| TAL | 1183 | 4.50% |
| MLM | 1221 | 4.25% |
| WAT | 457 | 2.50% |
| MKL | 3000 | 2.25% |

100%
Certain Underwriters
At Lloyd's
Per: Osprey Underwriting
Agency Ltd.

**Fiscal and Regulatory**

TAX PAYABLE
BY UNDERWRITER(S):        None

COUNTRY OF ORIGIN:        United States of America

OVERSEAS BROKER:         Wells Fargo Insurance Services USA, Inc.
                         601 Union Street, Suite 1300, Seattle, Washington 98101

US CLASSIFICATION:        Non-Regulated

ALLOCATION OF
PREMIUM TO CODING:        100% "G"

FSA CLIENT
CLASSIFICATION:           LARGE RISK

JWR
16-Feb-12

21

12

**Price Forbes & Partners Limited**                    **507 PRF**

UNIQUE MARKET REFERENCE: B0507 **M12PP01640**

---

Fiscal and Regulatory

FEE PAYABLE BY
CLIENT:              No

TOTAL               20%.
BROKERAGE:          22.50% or nett equivalent downwards only

OTHER DEDUCTIONS
FROM PREMIUM:  None

JWR
16-Feb-12

13

## Price Forbes & Partners Limited

**507 PRF**

UNIQUE MARKET REFERENCE: B0507 **M12PP01640**

PROTECTION AND INDEMNITY

Loss, if any, payable to          or order.

In the sum of *as per attached schedule.*

At and from the *as per attached schedule* until *as per attached schedule* against the liabilities of the Assured as hereinafter described, and subject to the terms and conditions hereinafter set forth, in respect of the vessel called the *as per attached schedule* (Tonnage          or by whatsoever other names the said vessel is or shall be named or called.

In consideration of the Stipulations Herein Named and of   , being Premium at the rate of

The Assurer hereby undertakes to make good to the Assured or the Assured's executors, administrators and/or successors, all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth:

| | |
|---|---|
| Loss of Life, injury and illness | 1. Liability for loss of life of, or personal injury to, or illness of, any person, **excluding, however, unless otherwise agreed by endorsement hereon,** liability under any Compensation Act to any employee of the Assured, (other than a seaman) or in case of death to his beneficiaries or others. |
| | Protection hereunder for loss of life or personal injury arising in connection with the handling of cargo of the vessel named herein shall commence from the time of receipt by the Assured of the cargo on dock or wharf or on craft alongside the said vessel for loading thereon and shall continue until delivery thereof from dock or wharf of discharge or until discharge from the said vessel on to another vessel or craft. |
| Hospital, medical, or other expenses | 2. Liability for hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life of, personal injury to, or illness of any member of the crew of the vessel named herein or any other person. Liability hereunder shall also include burial expenses not exceeding Two Hundred ($200) Dollars, when necessarily and reasonably incurred by the Assured for the burial of any seaman of said vessel. |
| Repatriation expenses | 3. Liability for repatriation expenses of any member of the crew of the vessel named herein, necessarily and reasonably incurred, under statutory obligation, excepting such expenses as arise out of or ensue from the termination of any agreement in accordance with the terms thereof, or by mutual consent, or by sale of the said vessel, or by other act of the Assured. Wages shall be included in such expenses when payable under statutory obligation, during unemployment due to the wreck or loss of the said vessel. |
| Damage to other vessel or property on board caused by collision | 4. Liability for loss of, or damage to, any other vessel or craft, or to the freight thereof, or property on such other vessel or craft, caused by collision with the vessel named herein, insofar as such liability would not be covered by full insurance under the *Marine policy* (including the four-fourths running-down clause). |
| Principle of cross-liabilities to | (a) Claims under this clause shall be settled on the principle of cross-liabilities to the same extent only as provided in the running-down clause above mentioned. |

JWR
16-Feb-12

14

## Price Forbes & Partners Limited

**507 PRF**

**UNIQUE MARKET REFERENCE: B0507 M12PP01640**

prevail

  (b) Claims under this clause shall be divided among the several classes of claims enumerated in this policy and each class shall be subject to the deduction and special conditions applicable in respect of such class.

  (c) Notwithstanding the foregoing, if any one or more of the various liabilities arising from such collision has been compromised, settled or adjusted without the written consent of the Assurer, the Assurer shall be relieved of liability for any and all claims under this clause.

Damage to other vessel or property on board not caused by collision

5.  Liability for loss of or damage to any other vessel or craft, or to property on such other vessel or craft, not caused by collision, provided such liability does not arise by reason of a contract made by the assured.

  Where there would be a valid claim hereunder but for the fact that the damaged property belongs to the Assured, the Assurer shall be liable as if such damaged property belonged to another, but only for the excess over any amount recoverable under any other insurance applicable on the property.

Damage to docks, piers, etc.

6.  Liability for damage to any dock, pier, harbor, bridge, jetty, buoy, lighthouse, breakwater, structure, beacon, cable, or to any fixed or movable object or property whatsoever, except another vessel or craft, or property on another vessel or craft.

  Where there would be a valid claim hereunder but for the fact that the damaged property belongs to the Assured, the Assurer shall be liable as if such damaged property belonged to another, but only for the excess over any amount recoverable under any other insurance applicable on the property.

Removal of wreck

7.  Liability for cost or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law, provided, however, that:

  (a) There shall be deducted from such claim for cost or expenses, the value of any salvage from or which might have been recovered from the wreck, inuring, or which might have inured, to the benefit of the Assured.

  (b) The Assurer shall not be liable for such costs or expenses which would be covered by full insurance under the *Marine policy* or claims arising out of hostilities or war-like operations, whether before or after declaration of war.

Cargo

8.  Liability for loss of, or damage to, or in connection with cargo or other property, excluding mail and parcel post, including baggage and personal effects of passengers, to be carried, carried, or which has been carried on board the vessel named herein;

**Provided, however, that no liability shall exist under this provision for:**

Specie, bullion, precious stones, etc.

  (a) Loss, damage or expense arising out of or in connection with the custody, care, carriage or delivery of specie, bullion, precious stones, precious metals, jewelry, silks, furs, bank notes, bonds or other negotiable documents or similar valuable property, unless specially agreed to and accepted for transportation under a form of contract approved, in writing, by the Assurer.

JWR
16-Feb-12



15

**Price Forbes & Partners Limited**                                      **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

| | |
|---|---|
| Refrigeration | (b) Loss of, or damage to, or in connection with cargo requiring refrigeration unless the space, apparatus and means used for the care, custody, and carriage thereof have been surveyed by a classification surveyor or other competent disinterested surveyor under working conditions before the commencement of each voyage and found in all respects fit, and unless accepted for transportation under a form of contract approved, in writing, by the Assurer. |
| Passengers' effects | (c) Loss, damage, or expense in connection with any passenger's baggage or personal effects, unless the form of ticket issued to the passenger shall have been approved, in writing, by the Assurer. |
| Stowage in improper places | (d) Loss, damage, or expense arising from stowage of underdeck cargo on deck or stowage of cargo in spaces not suitable for its carriage, unless the Assured shall show that every reasonable precaution has been taken by him to prevent such improper stowage. |
| Deviation | (e) Loss, damage, or expense arising from any deviation, or proposed deviation, not authorized by the contract of affreightment, known to the Assured in time to insure specifically the liability therefor, unless notice thereof is given to the Assurer and the Assurer agrees, in writing, that such insurance is unnecessary. |
| Freight on cargo short delivered | (f) Freight on cargo short delivered, whether or not prepaid or whether or not included in the claim and paid by the Assured. |
| Misdescription of Goods | (g) Loss, damage, or expense arising out of or as a result of the issuance of Bills of Lading which, to the knowledge of the Assured, improperly describe the goods or their containers as to condition or quantity. |
| Failure to surrender Bill of Lading | (h) Loss, damage, or expense arising out of delivery of cargo without surrender of Bill of Lading. |

**And provided further that**

| | |
|---|---|
| | (aa) Liability hereunder shall in no event exceed that which would be imposed by law in the absence of contract. |
| Protective clauses required in contract of affreightment | (bb) Liability hereunder shall be limited to such as would exist if the Charter Party, Bill of Lading or Contract of Affreightment contained the following clause (in substitution for the clause commonly known as the Jason Clause): |

"In the event of accident, danger, damage or disaster before or after commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the shipowner is not responsible, by statute or contract or

otherwise, the shippers, consignees or owners of the cargo shall contribute with the shipowner in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo."

JWR
16-Feb-12

16

## Price Forbes & Partners Limited                    **507 PRF**

**UNIQUE MARKET REFERENCE: B0507 M12PP01640**

When cargo is carried by the vessel named herein under a bill of lading or similar document of title subject or made subject to the Carriage of Goods by Sea Act, April 16,1936, liability hereunder shall be limited to such as is imposed by said Act, and if the Assured or the vessel named

herein assumes any greater liability or obligation than the minimum liabilities and obligations imposed by said Act, such greater liability or obligation shall not be covered hereunder.

When cargo is carried by the vessel named herein under a charter party, bill of lading or contract of affreightment not subject or made subject to the Carriage of Goods by Sea Act, April 16, 1936, liability hereunder shall be limited to such as would exist if said charter party, bill of lading,

or contract of affreightment contained the following clauses: a clause limiting the Assured's liability for total loss or damage to goods shipped to Two Hundred and Fifty ($250) Dollars per package, or in case of goods not shipped in packages, per customary freight unit, and providing for pro rata adjustment on such basis for partial loss or damage; a clause

exempting the Assured and the vessel named herein from liability for losses arising from unseaworthiness, even though existing at the beginning of the voyage, provided that due diligence shall have been exercised to make the vessel seaworthy and properly manned, equipped, and supplied; a clause providing that the carrier shall not be liable for

claims in respect of cargo unless notice of claim is given within the time limited in such Bill of Lading and suit is brought thereon within the limited time prescribed therein; and such other protective clauses as are commonly in use in the particular trade; provided the incorporation of such clauses is not contrary to law.

The foregoing provisions as to the contents of the Bill of Lading and the limitation of the Assurer's liability may, however, be waived or altered by the Assurers on terms agreed, in writing.

Assured's own      (cc)      Where cargo on board the vessel named herein is the property of the
cargo              Assured, such cargo shall be deemed to be carried under a contract containing the protective clauses described in the preceding paragraph, and such cargo shall be deemed to be fully insured under the usual form of cargo policy, and in case of loss thereof or damage thereto the Assured shall be

insured hereunder in respect of such loss or damage only to the extent that they would have been covered if said cargo had belonged to another, but only in the event and to the extent that the loss or damage would not be recoverable under a cargo policy as hereinbefore specified.

JWR
16-Feb-12

17

## Price Forbes & Partners Limited                    **507 PRF**

**UNIQUE MARKET REFERENCE: B0507 M12PP01640**

| | | |
|---|---|---|
| Cotton Bills of Lading | (dd) | The Assured's liability for claims under Custody Cotton Bills of Lading issued under the conditions laid down by the Liverpool Bill of Lading Conference Committee, is covered subject to previous notice of contract and payment of an extra premium of two (2 cents) cents per ton gross register per voyage, but such additional premium shall be waived provided every bale is re-marked at port of shipment on another portion of the bale. |
| Land transportation not included | (ee) | No liability shall exist hereunder for any loss, damage or expense in respect of cargo or other property being transported on land or on another vessel. |
| | | No liability shall exist hereunder for any loss, damage or expense in respect of cargo before loading on or after discharge from the vessel named herein caused by flood, tide, windstorm, earthquake, fire, explosion, heat, cold, deterioration, collapse of wharf, leaky shed, theft or pilferage unless such loss, damage or expense is caused directly by the vessel named herein, her master, officers or crew. |
| Customs, immigration or other fines or penalties | 9. | Liability for fines and penalties, including expenses necessarily and reasonably incurred in avoiding or mitigating same, for the violation of any of the laws of the United States, or of any State thereof, or of any foreign country; provided, however, that the Assurer shall not be liable to indemnify the Assured against any such fines or penalties resulting directly or indirectly from the failure, neglect, or default of the Assured or his managing officers or managing agents to exercise the highest degree of diligence to prevent a violation of any such laws. |
| Mutiny or other misconduct | 10. | Expenses incurred in resisting any unfounded claim by the master or crew or other persons employed on the vessel named herein, or in prosecuting such persons in case of mutiny or other misconduct. |
| Extraordinary expenses in case of quarantine, etc. | 11. | Liability for extraordinary expenses resulting from outbreak of plague or other contagious disease, including such expenses incurred for disinfection of the vessel named herein or persons on board, or for quarantine, but excluding the ordinary expenses of loading and/or discharging, and the wages and provisions of crew and passengers; each claim under this provision is subject to a deduction of Two Hundred |
| | | ($200) Dollars. It is provided further, however, that if the vessel named herein be ordered to proceed to a port when it is or should be known that calling there will subject the vessel to the extraordinary expenses above mentioned, or to quarantine or disinfection there or elsewhere, the Assurer shall be under no obligation to indemnify the Assured for any such expenses. |
| Deviation for purpose of landing injured or ill | 12. | Net loss due to deviation incurred solely for the purpose of landing an injured or sick seaman in respect of port charges incurred, insurance, bunkers, stores, and provisions consumed as a result of the deviation. |
| Cargo's proportion of general average | 13. | Liability for, or loss of, cargo's proportion of general average, including special charges, in so far as the Assured cannot recover same from any other source; subject however, to the exclusions of Section (8) and provided, that if the Charter Party, Bill of Lading, or Contract of Affreightment does not contain the quoted clause under Section 8(bb) the Assurer's liability hereunder shall be limited to such as would exist if such clause were contained therein. |

JWR
16-Feb-12

18

## Price Forbes & Partners Limited                    507 PRF

### UNIQUE MARKET REFERENCE: B0507 M12PP01640

| | |
|---|---|
| Costs and charges | 14. Costs, charges, and expenses, reasonably incurred and paid by the Assured in defense against any liabilities insured against hereunder in respect of the vessel named herein, subject to the agreed deductibles applicable, and subject further to the conditions and limitations hereinafter provided. |

### GENERAL CONDITIONS AND/OR LIMITATIONS

| | |
|---|---|
| Prompt notice of claim | Warranted that in the event of any occurrence which may result in loss, damage and/or expense for which this Assurer is or may become liable, the Assured will use due diligence to give prompt notice thereof and forward to the Assurer as soon as practicable after receipt thereof, all communications, processes, pleadings and other legal papers or documents relating to such occurrences. |
| Settlement of claims | The Assured shall not make any admission of liability, either before or after any occurrence which may result in a claim for which the Assurer may be liable. The Assured shall not interfere in any negotiations of the Assurer, for settlement of any legal proceedings in respect of any occurrences for which the Assurer is liable under this policy; provided, however, that in respect of any occurrence likely to give rise to a claim under |
| | this policy, the Assured are obligated to and shall take steps to protect their (and/or the Assurer's) interests as would reasonably be taken in the absence of this or similar insurance. If the Assured shall fail or refuse to settle any claim as authorized by Assurer, the liability of the Assurer to the Assured shall be limited to the amount for which settlement could have been made. |
| Assured to assist with evidence in defense, etc. | Whenever required by the Assurer the Assured shall aid in securing information and evidence and in obtaining witnesses and shall cooperate with the Assurer in the defense of any claim or suit or in the appeal from any judgment, in respect of any occurrence as hereinbefore provided. |
| Law costs | The Assurer shall not be liable for the cost or expense of prosecuting or defending any claim or suit unless the same shall have been incurred with the written consent of the Assurer, or the Assurer shall be satisfied that such approval could not have been obtained under the circumstances without unreasonable delay, or that such costs and charges were reasonably and properly incurred, such cost or expense being subject to the deductible. |
| | The cost and expense of prosecuting any claim in which the Assurer shall have an interest by subrogation or otherwise, shall be divided between the Assured and the Assurer, proportionately to the amounts which they would be entitled to receive respectively, if the suit should be successful. |
| | The Assurer shall be liable for the excess where the amount deductible under this policy is exceeded by A the cost of investigating and/or successfully defending any claim or suit against the Assured based on a liability or an alleged liability of the Assured covered by this insurance, or B the amount paid by the Assured either under a judgment or an agreed settlement based on the liability covered herein including all costs, expenses of defense and taxable disbursements. |
| Subrogation | The Assurer shall be subrogated to all the rights which the Assured may have against any other person or entity, in respect of any payment made under this policy, to the extent of such payment, and the Assured shall, upon the request of the Assurer, execute all documents necessary to secure to the Assurer such rights. |

JWR
16-Feb-12

28

19

## Price Forbes & Partners Limited                                  **507 PRF**

UNIQUE MARKET REFERENCE: B0507 **M12PP01640**

|  | The Assurer shall be entitled to take credit for any profit accruing to the Assured by reason of any negligence or wrongful act of the Assured's servants or agents, up to the measure of their loss, or to recover for their own account from third parties any damage that may be provable by reason of such negligence or wrongful act. |
|---|---|
| Cover elsewhere | Provided that where the Assured is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance or otherwise. |
| Assignments | No claim or demand against the Assurer under this policy shall be assigned or transferred, and no person, excepting a legally appointed receiver of the property of the Assured, shall acquire any right against the Assurer by virtue of this insurance without the expressed consent of the Assurer. |
| Actions against Assurers | No action shall lie against the Assurer for the recovery of any loss sustained by the Assured unless such action is brought against the Assurer within one year after the final judgment or decree is entered in the litigation against the Assured, or in case the claim against the Assurer accrues without the entry of such final judgment or decree, unless such action is brought within one year from the date of the payment of such claim. |
| Time limitation | The Assurer shall not be liable for any claim not presented to the Assurer with proper proofs of loss within six (6) months after payment thereof by the Assured. |
| Lay-up returns | At the expiration of this policy, the Assurer is to return {Response} for each thirty (30) consecutive days during the term of this insurance the vessel may be laid up in a safe port; or {Response} for each thirty (30) consecutive days during the term of this insurance the vessel may be laid up in a safe port without loading and/or discharging and without crew or cargo on board, provided the Assured give written notice to the Assurer as soon as practicable after the commencement and the termination of such lay-up period. |

**Cancellation provisions:**

(a) If the vessel named herein should be sold or requisitioned and this policy be cancelled and surrendered, the Assurer to return {Response} for each thirty (30) consecutive days of the unexpired term of this insurance.

(b) In the event of non-payment of premium within sixty (60) days after attachment, this policy may be cancelled by the Assurer upon five (5) days' written notice being given the Assured.

(c) In the event that Sections 182 to 189, both inclusive, of U. S. Code, Title 46, or any other existing law or laws determining or limiting liability of shipowners and carriers, or any of them, shall, while this policy is in force, be modified, amended or repealed, or the liabilities of shipowners or carriers be increased in any respect by legislative enactment, the Assurer shall have the right to cancel said insurance upon giving thirty (30) days' written notice of their intention so to do, and in the event of such cancellation, make return of premium upon a pro rata daily basis.

**Notwithstanding anything to the contrary contained in this policy, no liability attaches to the Assurer:**

JWR
16-Feb-12

20

**Price Forbes & Partners Limited**                    **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

For any loss, damage, or expense which would be payable under the terms of the {Response} form of policy on hull and machinery, etc., if the vessel were fully covered by such insurance sufficient in amount to pay such loss, damage, or expense.

For any loss, damage or expense sustained by reason of capture, seizure, arrest, restraint or detainment, or the consequence thereof or of any attempt thereat; or sustained in consequence of military, naval or air action by force of arms, including mines and torpedoes or other missiles or engines of war, whether of enemy or friendly origin; or sustained in consequence of placing the vessel in jeopardy as an act or measure of war taken in the actual process of a military engagement, including
embarking or disembarking troops or material of war in the immediate zone of such engagement; and any such loss, damage and expense shall be excluded from this policy without regard to whether the Assured's liability therefor is based on negligence or otherwise, and whether before or after a declaration of war.

For any loss, damage, or expense arising from the cancellation or breach of any charter, bad debts, fraud of agents, insolvency, loss of freight hire or demurrage, or as a result of the breach of any undertaking to load any cargo, or in respect of the vessel named herein engaging in any unlawful trade or performing any unlawful act, with the knowledge of the Assured.

For any loss, damage, expense or claim arising out of or having relation to the towage of any other vessel or craft, whether under agreement or not, unless such towage was to assist such other vessel or craft in distress to a port or place of safety, provided, however, that this clause shall not apply to claims under this policy for loss of life or personal injury to passengers and/or members of the crew of the vessel named herein arising as a result of towing.

For any claim for loss of life or personal injury in relation to the handling of cargo where such claim arises under a contract of indemnity between the Assured and his sub-contractor.

It is expressly understood and agreed if and when the Assured under this policy has any interest other than as a shipowner in the vessel or vessels named herein, in no event shall the Assurer be liable hereunder to any greater extent than if such Assured were the owner and were entitled to all the rights of limitation to which a shipowner is entitled.

Unless otherwise agreed by endorsement to this policy, liability hereunder shall in no event exceed that which would be imposed on the Assured by law in the absence of contract.

Liability hereunder in respect of any one accident or occurrence is limited to the amount hereby insured.

January, 1956
SP23
CLA507

JWR
16-Feb-12

21

**Price Forbes & Partners Limited**                    **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

(20.02.92)

### OSPREY CLAIMS NOTIFICATION CLAUSE

Notwithstanding anything else to the contrary contained in this policy, it is hereby agreed that the insurers hereunder are not liable for any loss, damage, injury, expense, cost or claim whatsoever which otherwise would be recoverable under this policy of insurance, unless notice of such loss, damage, injury, expense, cost or claim or circumstances which have not but may give rise to a claim against the Assured is given in writing within 36 months from the expiry date of this policy.

If the aforesaid 36 month period relating to written notifications to insurers is invalidated by any law to which the Assured is subject, then such period shall be deemed to be amended to the minimum period permitted by such law.

It is understood and agreed by the Assured, that, in the event of any occurrence which may result in loss, damage, injury, expense of claim for which Insurers hereunder are or may become liable under this policy, notice thereof shall be given to said Insurers as soon as practicable and, further, that any and every notice of claim, pleading and paper of any kind relating to such occurrence, shall be forwarded promptly on behalf of the Assured to these Insurers.



22

## Price Forbes & Partners Limited                     **507 PRF**

**UNIQUE MARKET REFERENCE: B0507 M12PP01640**

(1.04.96)

### EXCESS COLLISION &/OR TOWER'S LIABILITY ENDORSEMENT

Issued by Osprey Underwriting Agency Ltd.

Notwithstanding the tower's liability exclusion contained in both the Protection and Indemnity Clauses SP-23 Form (Revised 1/56) and the Osprey Underwriting Agency Ltd Protection and Indemnity Clauses (1.04.96)

a)   the Underwriters agree to indemnify the Assured for all sums not recoverable in full by the Assured under the Collision Clause of the policies on hull and machinery (including Increased Value with excess liabilities, if any, or under any other policies insuring collision liability) on the vessel named herein by reason of the Assured's collision liability exceeding the amount insured against collision liability as stated in such policies, but in no event for more than the difference between such amount insured and the limit set out in this Certificate subject always to the Combined Single Limit of this Certificate;

b)   in the event the vessel is a towing vessel:-
i) the Underwriters agree to indemnify the Assured for sums not recoverable in full by the Assured under the Collision Clause, incorporating tower's liability, of the policies on hull and machinery (including Increased Value with excess liability, if any, or under any other policies insuring collision and tower's liability) on the vessel named herein by reason of the Assured's collision and/or tower's liability exceeding the amounts insured against collision and tower's liability as stated in such policies, but in no event for more than the difference between such amount insured and the limit set out in this Certificate subject always to the Combined Single Limit of this Certificate;
ii) unless otherwise expressly agreed, the amount insured against collision and tower's liability as stated in such hull and machinery policies shall be deemed to be not less than $250,000, and
iii) unless otherwise expressly agreed, the maximum amount recoverable hereunder in respect of Excess Towers Liabilities relating to Ocean tows shall be the difference between the amount insured against collision and tower's liability as stated in such hull and machinery policies and the lesser of $1,000,000, or any separate sub-limit set out in this Certificate.

The Underwriters shall not be required to indemnify the Assured under section (a) of this Endorsement with respect to any vessel insured under this section (b).

It is a condition of this Endorsement that the vessel insured hereunder be fully insured for hull and machinery under the terms of the American Institute Hull Clauses (June 2nd, 1977) 7, or, if a towing vessel the Tug Syndicate Form (August 1st, 1976) 53R-1, for the full value of the vessel and that said policy, or policies, be maintained in full effect during the policy period without reduction of coverage or limits except for any reduction of the aggregate limit, or limits, contained therein during the period of this Certificate. Failure of the Assured to comply with the foregoing or the failure of the hull and machinery insurers to respond to a claim shall not invalidate this Certificate, but in the event of such failure, the Underwriters shall only be liable to the same extent as they would have been had the Assured complied with this condition and the hull and machinery insurers responded to the claim

Excluding Rig Towage Absolutely.



JWR
16-Feb-12

23

**Price Forbes & Partners Limited**                                      **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

(20.02.92)

### OSPREY FISHING VESSEL CLAUSE

Issued by Osprey Underwriting Agency Ltd.

Notwithstanding anything to the contrary contained in this Policy, it is hereby understood and agreed that this Policy is subject to the following exclusions and that this Policy shall not apply to:

1    any costs, liabilities and expenses arising from the insured vessel entering prohibited waters or engaging in unlawful fishing;

2.    any claims for loss of, or damage to, any nets and gear whatsoever of any vessel including those of the insured vessel;

3.    any claims for loss of, damage to or liability in respect of any vessel, including the insured vessel, caused by the nets and gear of the insured vessel;

4.    any claim for bodily injury or personal injury or loss of, damage to, or loss of use of property directly or indirectly caused by asbestos and/or lead;

5.    any costs, liabilities and expenses for loss of life of, injury to, or illness of any person:-

    a.    on board the insured vessel other than the named crew except when such vessel is safely moored in port;

    b.    hired as a processor whether or not such person is legally entitled to the rights or remedies of a crew member;

6.    any claim in connection with cargo and/or catch whatsoever whether or not on board the insured vessel;

7.    any claims for loss, damage, liability or expense arising directly or indirectly from pollution or contamination by any substance whatsoever;

8.    excess collision liability unless otherwise endorsed hereon;

9.    any liability imposed on the Assured as punitive or exemplary damages howsoever described.

The Institute Radioactive Contamination Exclusion Clause (1.10.90) shall be deemed to be incorporated into the terms of this Policy.

It is understood that liability hereunder in respect of loss, damage, costs, fees, expenses and/or claims arising out of, or in consequence of, any one occurrence is limited to the amount hereby insured.

This Policy may be cancelled by the Underwriter or the Assured upon thirty (30) days written or telegraphic notice. The Underwriters may send notice to the broker of record at the time. Canceling Returns Only.

This insurance is subject to English law and practice and any dispute arising hereunder is to be referred to arbitration in London, one Arbitrator to be nominated by the Assured and the other by Osprey. In case the Arbitrators, shall not agree, then the dispute shall be submitted to an Umpire to be appointed by them.  The award of the Arbitrators or the Umpire shall be final and binding upon both parties.

The Osprey Claims Notification Clause (20.02.92) shall be deemed to be incorporated into the terms of this Policy.

JWR
16-Feb-12

33

24

## Price Forbes & Partners Limited

**507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

(01.07.92)

### RESTRICTED POLLUTION COVERAGE WORDING

This Certificate will not indemnify the Assured against any sum(s) paid, nor insure against any liability, with respect to any loss, damage, cost, liability, expense, fine or penalty of any kind or nature whatsoever, and whether statutory or otherwise, incurred by or imposed on the Assured, directly or indirectly, in consequence of or with respect to, the actual or potential discharge, emission, spillage or leakage upon or into the seas, waters, land or air, of oil, petroleum products, chemicals or other substances of any kind or nature whatsoever.

IN CONSIDERATION OF AN ADDITIONAL PREMIUM THE ABOVE POLLUTION EXCLUSION CLAUSE SHALL NOT APPLY TO LIABILITY OF THE ASSURED.

1.     For loss of life of, or bodily injury to, any person; or,

2.     For loss, damage or expense to any cargo carried on board the insured Vessel(s);

Provided always that

1)     such liability is insured elsewhere under the terms and conditions of this Certificate, and all other terms and conditions, including any deductible provisions, of this Certificate shall remain unchanged.

and

2)     such liability arises in consequence of the sudden and accidental discharge, emission or spillage of polluting or contaminating substances.

Notwithstanding anything contained herein to the contrary, it is understood and agreed that this Certificate excludes any loss, damage, cost, liability, expense, fine, penalty or punitive damage resulting from the U.S. Oil Pollution Act of 1990 and/or Comprehensive Environmental Response Compensation and Liability Act of 1980 and/or Federal Water Pollution Control Act and/or any other similar Federal and/or State Law, Act, and/or Regulation.



JWR
16-Feb-12

34

25

**Price Forbes & Partners Limited**                                    **507 PRF**

UNIQUE MARKET REFERENCE: B0507 **M12PP01640**

### BLANKET ADDITIONAL ASSUREDS AND WAIVERS OF SUBROGATION

Privilege is hereby granted the Assured to name others for whom the Assured is performing work as Additional
Assureds on this Policy provided the Assured shall have exercised this option prior to loss. Privilege is also
granted the Assured to release from Liability others for whom the Assured is performing operations, or who are
performing operations for the Assured, provided the Assured shall have exercised this option prior to loss; and
these insurers waive all rights of subrogation against any parties so released.

Notwithstanding the preceding provisions, no party shall be deemed an Additional Assured or favoured with a
waiver of subrogation on any vessel insured hereunder which is not actually engaged or involved in the intended
operations at the time of the loss, if any.

**In respect of any/all Additional Assureds named herein, it is noted and agreed, where required by written
contract;**

1.     This policy shall be deemed primary.

2.     Any reference to "Other Than Owner", "As Owner" and/or "Other Insurance" clauses contained in this
       Policy shall be deemed deleted. Notwithstanding, if a claim is made by anyone other than the Owner
       and/or Operator of the Vessel(s) insured hereunder, such person or entity shall not be entitled to wider
       coverage than would the Owner and/or Operator had claim been made by the Owner and/or Operator
       as an Assured under this policy.

3.     The naming of Additional Assureds herein shall in no way extend the limit of liability for any one loss
       or occurrence beyond that stated in the policy to which this clause applies. Regardless of the
       number of additional assureds named hereunder there shall be one Combined Single Limit in respect of
       all claims made under this policy whether by the original named Insured or additional Assured.

Subject always to the terms, clauses and conditions of the original policy.

(15.04.91)

### AUTOMATIC ACQUISITION CLAUSE

This policy is extended to cover automatically any vessel(s) which the Assured (and/or affiliated, subsidiary, or
interrelated companies) may purchase, bareboat charter or acquire provided that the Assured will notify
Underwriters as soon as possible after each purchase, bareboat charter or acquisition and pay an additional
premium from the date of each purchase, bareboat charter or acquisition.

JWR
16-Feb-12

26

**Price Forbes & Partners Limited**                **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

### INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL AND ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE

This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith

1.      In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from

1.1  ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

1.2  the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

1.3  any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

     1.4   the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.  The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other similar peaceful purposes

     1.5   any chemical, biological, bio-chemical, or electromagnetic weapon.

10/11/2003
CL.370

(18.09.2001)

### OSPREY TERRORISM & MALICIOUS ACTS EXCLUSION CLAUSE

In no case shall this insurance cover any loss damage liability or expense caused by or relating to:-

1.      The attempt to or actual detonation of any explosive or the operation of any munition or other similar harmful device, including but not limited to biological &/or chemical device.

2.      The act or attempted acts of any terrorist or group of terrorists, irrespective of their motives be they political, religious or other, or any person or group acting with a malicious intent.

JWR
16-Feb-12

27

**Price Forbes & Partners Limited**                    **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

JH2010/009
29th July 2010

### Sanction Limitation and Exclusion Clause

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

### U.S. Terrorism Risk Insurance Act of 2002 as amended
### Not Purchased Clause

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5092
21/12/2007
Form approved by Lloyd's Market Association

### OSPREY LAW AND PRACTICE CLAUSE

Notwithstanding anything else to the contrary, this insurance is subject to English law and practice and any dispute under or in connection with this insurance is to be referred to Arbitration in London, one Arbitrator to be nominated by the Assured and the other by Osprey on behalf of Underwriters. The Arbitration shall be conducted pursuant to exclusive supervision of the English High Court of Justice. In case the Arbitrators shall not agree, then the dispute shall be submitted to an Umpire to be appointed by them. The award of the Arbitrators or the Umpire shall be final and binding upon both parties. In the event of a conflict between this clause and any other provision of this insurance, this clause shall prevail and the right of either party to commence proceedings before any Court or Tribunal in any other jurisdiction shall be limited to the process of enforcement of any award hereunder.



JWR
16-Feb-12

28

## Price Forbes & Partners Limited

**507 PRF**

UNIQUE MARKET REFERENCE: B0507 **M12PP01640**

(1.04.96)

### OSPREY SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of the Underwriters severally subscribing this insurance (the Underwriters) to pay any amount claimed to be due hereunder, the Underwriters, at the request of the Assured, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America.

Notwithstanding any provision elsewhere in this insurance relating to jurisdiction, it is agreed that the Underwriters have the right to commence an action in any court of competent jurisdiction in the United States of America, and nothing in this clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to remove an action to a United States Federal District Court or to seek remand therefrom or to seek a transfer of any suit to any other court of competent jurisdiction as permitted by the laws of the United States of America or any state therein.

Subject to the Underwriters' rights set forth above:

(a) It is further agreed that the Assured may serve process upon any senior partner in the firm of:

Mendes & Mount (Attorneys), 750 Seventh Avenue, New York N.Y. 10019-6829

and that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

(b) The abovenamed are authorised and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Assured to give a written undertaking to the Assured that they will enter a general appearance upon the Underwriters' behalf in the event such a suit shall be instituted.

(c) The right of the Assured to bring suit as provided herein shall be limited to a suit brought in its own name and for its own account. For the purpose of suit as herein provided the word Assured includes any mortgagee under a ship mortgage which is specifically named as a loss payee in this insurance and any person succeeding to the rights of any such mortgagee.

(d) Further, pursuant to any statute of any state, territory or district of the United States of America which makes provision therefore, Underwriters hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office (the Officer), as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Assured or any beneficiary hereunder arising out of this contract of insurance, and hereby designate the abovenamed as the person to whom the Officer is authorised to mail such process or a true copy thereof.

If this clause is attached to a contract of reinsurance the terms insurance and Assured shall mean reinsurance and Reassured respectively

Subject, in all respects, to the Osprey Law and Practice Clause as contained in the clauses dated 1.04.96



JWR
16-Feb-12

38

29

## Price Forbes & Partners Limited            **507 PRF**

UNIQUE MARKET REFERENCE: B0507 M12PP01640

Shelford's Boat Ltd Etal
5303 Shilshole Avenue NW, Seattle, Washington 98107-4000

Protection & Indemnity

5 Year Loss Summary
(As of 1st February 2011)

| YEAR | PAID – USD | RESERVE – USD | TOTAL – USD |
|------|-----------|----------------|-------------|
| 2006 – 2007 | 13,331.80 | Nil | 13,331.80 |
| 2007 – 2008 | 348,235.78 | 13,318.50 | 361,554.28 |
| 2008 – 2009 | 200,697.84 | Nil | 200,697.84 |
| 2009 – 2010 | 34,242.41 | 42,988.02 | 77,230.43 |
| 2010 – 2011 | Nil | Nil | Nil |
| TOTALS | 596,507.83 | 56,306.52 | 652,814.35 |

E & O.E.

Dated in London: 8th February 2011

JWR
16-Feb-12

30

*EXHIBIT C*
*TO DECLARATION OF*
*RICHARD F. ALLEN IN SUPPORT*
*OF OSPREY'S MOTION TO DISMISS*

Case No: A3/2013/0824

Neutral Citation Number: [2013] EWCA Civ 1660
**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM QUEENS BENCH DIVISION**
**COMMERCIAL COURT**
**MR JUSTICE FLAUX**
**2011 FOLIO 1047**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Friday 20th December 2013

Before :

**LORD JUSTICE MOORE-BICK**
**LORD JUSTICE BRIGGS**
and
**LORD JUSTICE CHRISTOPHER CLARKE**
- - - - - - - - - - - - - - - - - - - - -

Between :

AstraZeneca Insurance Company Ltd          **Appellant**
- and -
(1) XL Insurance (Bermuda) Ltd          **Respondents**
(2) ACE Bermuda Insurance Ltd.

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - - -

**Mr Paul Stanley QC and Mr Geraint Webb QC** (instructed by **DAC Beachcroft LLP**) for
the **Appellant**
**Mr David Edwards QC and Mr David Scorey** (instructed by **Clyde & Co**) for the
**Respondent**
- - - - - - - - - - - - - - - - - - - - -

**Judgment**

**LORD JUSTICE CHRISTOPHER CLARKE:**

1.    The AstraZeneca group of companies is a major worldwide pharmaceutical group. The group (hereafter "AZ") includes the US company AstraZeneca Pharmaceuticals LP ("AZPLP") and the Canadian company AstraZeneca Canada Inc ("AZC"). AstraZeneca Insurance Company Ltd, the claimant and now appellant (hereafter "AZICO") is the captive insurer of AZ. It provided insurance cover to AZ, including AZPLP and AZC, for the period of 36 months from 1 January 2001 to 31 December 2003, including for a layer of £ 133,333,333 excess of £ 365 million. The policy by which it did so ("the Policy") is agreed to have been based on form XL004, together with amendments effected by Endorsements to that Policy.

2.    Each of the defendants, and now respondents, (hereafter "the reinsurers"), both of which are incorporated in Bermuda, agreed to reinsure AZICO for a 50% share in respect of the insurance provided by AZICO under the Policy. In the case of ACE Bermuda, the second respondents, that was subject to a limit of $ 100 million per occurrence. The reinsurance contracts covered the period 31 December 2000 to 31 December 2003. AZICO had agreed to provide cover to AZ in accordance with commitments which had been obtained from the reinsurers.

3.    The factual background to the preliminary issues which have led to this appeal are set out in the following paragraphs of the judge's judgment:

> "6 ...............From 1997, AZ manufactured, marketed and sold in the United States and Canada through the US and Canadian companies in the Group, a second generation atypical antipsychotic drug under the name "Seroquel" which was approved by the United States Food and Drug Administration ("the FDA") on 26 September 1997. At all material times, the label for Seroquel approved by the FDA contained information about weight gain and diabetes.
>
> 7 On 28 August 2003 a putative class action (Zehel-Miller) was filed against AZPLP in Florida in which the plaintiffs alleged (i) that Seroquel caused personal injury; (ii) that Seroquel was defective; and (iii) that there had been a failure by AZPLP to provide adequate warning. The Complaint in that action was first notified to the claimant on or about 11 September 2003. By a letter dated 1 December 2003, AZPLP issued the claimants with a Notice of Integrated Occurrence pursuant to Article V of the Policy.
>
> 8 Since that action was commenced, numerous plaintiffs in the United States and Canada have brought proceedings or joined lawsuits against AZ alleging that Seroquel has caused them personal injury. As at 31 October 2012, the claimant has settled claims presented by AZ for legal costs incurred in defending the claims and for settlements made in respect of the claims made against AZ of some £83.5 million excess of £365 million. It would appear that in only one of the cases has the matter been litigated through to a full trial and that resulted in a verdict for the defence. Other claims have been dismissed summarily.
>
> 9 The vast preponderance of what AZ has paid out represents legal costs incurred in defending the claims, US$786 million, as against US$63.7 million paid out in settlements (representing on average, including settlements agreed

**42**

> *in principle, about US$20,000 per plaintiff). The claimant insurer has indemnified AZPLP and AZC in respect of the legal costs incurred in defending the claims (referred to as "Defense Costs" in the Policy ...."). It has also indemnified those insureds in respect of about 50% of settlement sums paid, but declined to indemnify in respect of the other 50% on various grounds, such as that the claims relate to injuries caused by Seroquel sold after the date of the Notice of Integrated Occurrence. The claimant claims in the present proceedings that it is entitled to be indemnified by the defendants pursuant to the reinsurance contracts, in respect of all sums it has paid in respect of settlements and Defense Costs, within the relevant layer. The defendants deny any such entitlement to an indemnity."*

4.   AZICO does not presently put forward a positive case that AZ was liable for any of the claims, assuming a correct application of the law governing the claims to the evidence as properly analysed – the test under English law for determining whether the insured has demonstrated that it was under an actual legal liability to the third party whose claim it has settled: per Aikens J, as he then was, in **Enterprise Oil v Strand Insurance Co Ltd** [2007] Lloyd's Rep IR 186 at [72]. Nor did AZ put forward such a case to AZICO.

5.   This appeal is brought in respect of the answer which the judge gave to two preliminary issues, which are set out below. The first issue was phrased in a somewhat convoluted manner. The essential question, however, is whether under the Policy it is necessary for AZ, if it is to recover from AZICO, to establish that AZ was legally liable to those who made claims against it in relation to Seroquel, or whether it is sufficient that AZ settled an arguable liability with the consent of AZICO, which, as is common ground, was given. The settlements approved by AZICO were commercial settlements in the sense that they represented a settlement of modest amounts per claim which reflected the risks of litigation. They were not reached on the footing that they represented a reasonable amount in respect of what was an actual liability. The reinsurances were, so far as is presently material, on the same terms as the underlying insurance so that if AZ had to establish actual liability in order successfully to claim against AZICO, the same applied to any claim by AZICO under the reinsurances.

6.   The second issue is whether the reinsurers are liable to indemnify AZICO in respect of Defense[1] Costs, in circumstances where only one claim has proceeded to judgment and in respect of that claim liability was not established.

7.   XL004 is a Bermuda Form liability insurance. The nature of that form of insurance was summarised by the judge in these terms:

> *"3...... The Bermuda Form was introduced by insurance companies, primarily in the first instance the present defendants, XL and ACE, when the US casualty insurance market collapsed in 1985. The intention of XL and ACE and of the corporate entities responsible for their initial capitalisation was to achieve a form of policy which would meet the needs for liability insurance of such substantial corporations, specifically those which faced large product liability exposures in the United States, whilst providing "a balanced policy form, aiming to hold the ring fairly between the interests of policyholders and*

---

[1] I use the American spelling, as in the Policy.

*the interests of investors, as the same industrial corporations were in both roles"[1].*

*4   The resolution of disputes under an unamended Bermuda Form Policy is usually by London arbitration before three arbitrators, but on the basis that the contract of insurance or reinsurance is expressly governed by New York law. By this form of dispute resolution, major US companies and their liability insurers and reinsurers are able to have their policy disputes determined outside the United States and without the risk of jury trial, but pursuant to a system of state law for the determination of insurance disputes recognised to be more developed and neutral than that of other states in the United States[2]. A substantial number of Bermuda Form arbitrations have taken place in London over the years, but because the insurances or reinsurances in question are governed by New York law, no questions of construction of the Bermuda Form have come before the English Courts on appeal under section 69 of the Arbitration Act 1996 (although this court is the supervisory court under that Act)."*

8.   However, the Policy was, by Endorsement 14, made expressly subject to English law. AZICO and the reinsurers waived the arbitration clause in the reinsurance and agreed that the Commercial Court should determine the current dispute. This is the first occasion on which issues of construction of the Bermuda Form have come before the Commercial Court or this Court.

9.   The two preliminary issues which the parties sought to have determined were as follows:

"i)   Does the Insured's entitlement to indemnity under the Policy against sums which it pays in settlement of claims, depend on whether the Insured would, on a balance of probabilities, have been liable for the claims in question, assuming a correct application of the law governing the claims to the evidence as properly analysed, so that the Insurer would always be entitled to refuse to approve settlement (or, 'would not be bound to approve settlement', being the formulation suggested by the Reinsurers) when the Insured does not assert (or, 'assert and prove', being the formulation suggested by the Claimant) that it would, on a balance of probabilities, have been liable for the claims in question?

ii)   Other than in cases where the Insured's relevant liability is established by judgment of a court of competent jurisdiction, does the Insured's entitlement to indemnity under the Policy in respect of Defense Costs depend on whether the Insured would, on a balance of probabilities, have been liable for the claims in question, assuming a correct application of the law governing the claims to the evidence as properly analysed?"

10.   The answer which the judge gave to the first of these questions was that AZ was only entitled to an indemnity under the Policy if, on the balance of probabilities and assuming a correct application of the law governing the claim in question to the evidence properly analysed, AZ was under an actual liability for the claim.

11.      The answer which he gave to the second question was that AZ was only entitled to an indemnity for Defense Costs where it established that it was liable for the claim in question in the same sense as in relation to the answer to the first issue.

*The terms of the Policy*

12.      The Policy is very sizeable. Some of its paragraphs are extremely wordy, particularly when read with the definitions of the terms inserted into the text, which itself repeats some elements of the definitions themselves. The judge helpfully set out those terms which were of particular relevance. That summary is contained in the Appendix to this judgment. The emboldening of particular defined words is in the original. I have not, however, replicated it in the body of this judgment.

*Particular features of the Policy*

13.      A number of features of the Policy are of particular significance. First, it is governed by English law. Second, AZICO has no duty to defend. Third, it does not contain a "follow the settlements" clause or anything similar. Fourth, it is an Occurrence Reported policy, that is, it covers the insured against liability arising out of events occurring and reported during the period of the policy.

14.      The Policy also provides for the aggregation of personal injuries into one Occurrence. Thus Definition V (2), so far as applicable to Personal Injuries, provides:

> "*Except as provided in paragraph (3) below, where an Occurrence exists and a series of and/or several actual or alleged Personal Injuries....occur which are attributable directly, indirectly or allegedly to the same actual or alleged event condition, cause, defect, hazard and/or failure to warn of such, all such actual or alleged Personal Injuries ... shall be added together and treated as encompassed by one Occurrence irrespective of the period ... or area over which the actual or alleged Personal Injuries ... occur or the number of such actual or alleged Personal Injuries ... provided however that any actual or alleged Personal Injury ... which is Expected or Intended by any Insured shall not be included in any Occurrence.*"

15.      Definition V (3) is somewhat obscure but the essential effect of it and of Article V C is that, provided that the Notice identifies an Occurrence as an Integrated Occurrence (as happened in this case) the Policy potentially responds in the case of Personal Injuries attributable to the same actual or alleged event etc. AZ thus has the ability to bring within the same policy period Personal Injuries which are or are said to be attributable to the same event etc., even if they occur after the Policy has terminated.

*Issue 1*

16.      Under English law a liability policy is, generally speaking and in the absence of wording to the contrary, a policy which indemnifies the insured in respect of actual liability. That means that, in order to recover from his insurer the insured must show that he was liable to the person who claimed against him. Liability cannot be determined in a legal vacuum. Hence the need to assume, for this purpose, a correct application of the law governing the claim in question to the facts properly found.

17.    In the event of dispute the existence of liability has to be established to the satisfaction of the insurer, or, failing that, by the judge or arbitrator who has jurisdiction to decide such a dispute. It is not, therefore, necessarily sufficient for the insured to show that he has been held liable to a claimant by some court or tribunal or that he has agreed to settle with him. In practice the fact that this has occurred may cause or persuade the insurer to pay, but, if it does not, the insured must prove that he was actually liable. Under English law the ultimate arbiter of whether someone is liable, if insured and insurer cannot agree, is the tribunal which has to resolve their disputes (or any relevant appeal body). It may hold that there was in fact no actual liability and that an insured who thought, or another tribunal which decided, that there was, liability was in error either on the facts or the law or both.

18.    This principle is potentially very inconvenient for insureds. It may mean that they face weak or dubious claims, which it would be commercially expedient to settle, but in respect of which, if they settle, they may not recover against the insurer because the claims cannot be shown to be well founded. In such a situation they may have to soldier on with the defence and hope to persuade the insurer that it is in his best interests to allow them to settle before trial and to indemnify them when they do, on the basis that, if they lose, the insurer is more likely to have to pay, and to pay more than he would if there was no settlement. Even if they are held liable, this may not in practice, and does not in law, mean that they are automatically covered. The insurer may still say that they were not liable.

19.    There are ways of obviating or reducing these difficulties. The policy does not have to be a liability policy. The insured can seek (no doubt at a price) cover which insures him against claims made, or judgments given, or against occurrences. The policy may contain a follow the settlements clause whereby the insurer is bound to follow the settlements of the insured, in which case the reinsurer will be bound if the insured has made a settlement in a reasonable and business-like manner. The policy may contain a QC clause or a clause similar thereto. The policy may contain provisions whereby actual liability is, as between the insurer and the insured, taken to have been established if certain conditions are met. If the insurer was a party to the proceedings in which the claim against the insurer was determined it will probably be estopped from disputing that the insurer was liable; and, even if it was not a party, it may have agreed to be bound by the result.

20.    Lastly, an insured may seek the consent of his reinsurer to the settlement. In the present case we were told that AZ told AZICO that they had a settlement in principle in respect of a number of cases subject to any necessary approval by insurers and reinsurers. AZICO's solicitors asked the reinsurers' solicitors for consent. The response from them was to say that there was no evidence that Seroquel causes diabetes and that there was no liability on the part of AZICO or the reinsurers. AZICO then told AZ that they had no objection to AZ entering into the settlement and would not subsequently contend that it was entered into without AZICO's consent, but that AZICO was *"unable to confirm that the settlement falls within the coverage it has provided and therefore reserves all its rights"*. That reservation was subsequently withdrawn. But the agreement of the reinsurers to the settlement was never obtained.

21.    That liability policies require the establishment of actual liability is apparent from considerations of language and English authority. As to the former, "liability" *prima facie* means the state of being liable and not alleged liability. As Aikens J said in

**Enterprise Oil** "*One cannot be obligated to pay sums by law if there is only an alleged liability*" [65][72].

22.     As to the latter, the principle is summarised in **MacGillivray** on **Insurance Law** (12th edition) at 29-006 as being that "*liability insurance provides an indemnity against actual established liability as opposed to mere allegations*". The position which I have set out in paragraphs 17 and 18 above is vouched for or supported in several cases which the judge considered including: **West Wake Price & Co v Ching** [1957] 1 WLR 45, 48-51; **Commercial Union Assurance v NRG Victory Reinsurance [1998]** 2 Lloyd's Rep 600; **MDIS v Swinbank** [1999] 1 Lloyd's Rep IR 516, 524; **Structural Polymer Systems Ltd v Brown** [2000] Lloyd's Rep IR 64, 67; **Thornton Springer v NEM Insurance Co Ltd** [2000] Lloyd's Rep IR 590 [34]; **Enterprise Oil**, which contained a pro-insured policy interpretation clause ("*In the event of any conflict of interpretation between the various clauses and conditions the broadest and least restrictive wording to the benefit of the insured shall always prevail*"); and **Omega Proteins v Aspen Insurance UK Ltd** [2010] EWHC 2280 (Comm).

23.     In **Omega Proteins** I endeavoured to summarise the position as follows:

"1.     *The insured must establish that it has suffered a loss which is covered by one of the perils insured against: **West Wake**; **Post Office v Norwich Union** [1967] 2 QB 363; **Bradley v Eagle Star Insurance Co Ltd** [1989] AC 957; **Horbury Building Systems Ltd v Hampden Insurance NV** [2004] 2 CLC 453, 464;*

2.      *That may be done by showing a judgment or an arbitration award against the insured or an agreement to pay;*

3.      *The loss must be within the scope of the cover provided by the policy;*

4.      *As a matter of practicality, the judgment, award, or agreement may settle the question as to whether the loss is covered by the policy because the insurers will accept it as showing a basis of liability which is within the scope of the cover;*

5.      *But neither the judgment nor the agreement are determinative of whether or not the loss is covered by the policy (assuming that the insurer is not a party to either and that there is no agreement by the insurer to be bound).*

6.      *It is, therefore, open to the insurers to dispute that the insured was in fact liable, or that it was liable on the basis specified in the judgment; or to show that the true basis of his liability fell within an exception;*

7.      *Thus, an insured against whom a claim is made in negligence, which is the subject of a judgment, may find that his insurer seeks to show that in reality the claim was for fraud or for something else which was not covered, or excluded by, the policy: **MDIS Ltd v Swinbank**;*

8.      *Similarly, an insured who is held liable in fraud (which the policy does not cover) may be able to establish, in a dispute with his insurers, that, whatever the judge found, he was not in fact fraudulent, but only negligent and that he was entitled to cover under the policy on that account.*"

As is apparent from that summary the insured must establish both a loss and a liability. The former will be established by a judgment against him or a settlement: **Post Office v Norwich Union** [1967] 2 QB 363; **Bradley v Eagle Star** [1989] AC 957; but the latter may not.

*The meaning of the Policy*

24.   The Policy must be interpreted in its commercial context, having regard to the circumstances that were or should have been apparent to reasonable persons in the position of the parties. Mr Paul Stanley QC for AZICO had submitted to the judge that one relevant circumstance was that the Bermuda Form is usually governed by New York law under which, as he submitted, the Policy would be construed as providing coverage for liability established by a reasonable and bona fide settlement or by a judgment, irrespective of whether there was an actual legal liability.

25.   The judge rejected this proposition as heretical, and rightly so. The express choice of English law means that the Policy has to be construed against the background and in the context of what English law provides: **Hooley Hill Rubber v Royal Insurance** [1920] 1 KB 257, 272. In addition the judge held that, under New York law, cases where an insurer has been held bound to indemnify an assured in respect of an alleged liability without the need to prove it arise because of a substantive principle of New York law that an insurer who is bound to defend a claim of which he is notified, but who declines to do so, is bound by a good faith and reasonable settlement or a judgment against the insured. This is a principle of New York law, not a construction of the wording of the policy: **Feuer v Menkes Feur** 8 A.D. 2d 294 (1959); **Luria Brothers v Alliance Assurance** 780 F. 2d 1082, (1986) at 1091; **Uniroyal Inc v The Home Insurance Co** 707 F Supp 1368 (1988) at 1379.

26.   Against that background the terms of the policy give every indication that the policy provides an indemnity against actual liability. The Coverage provided by Article I is, so far as presently relevant:

> "*to indemnify the Insured for Ultimate Net Loss the Insured pays by reason of liability imposed by law for Damages on account of Personal Injury*".

Both the wording quoted, taken as a whole, and the defined terms of "*Ultimate Net Loss*" and "*Damages*", on a natural reading relate to actual liability. As to the former, the indemnity is for Ultimate Net Loss paid by reason of liability imposed by law for Damages. Nothing in that phraseology is apt to indicate that the indemnity is against anything other than actual liability which the relevant law imposes or that there is to be any departure from the usual English law position. The Insured cannot properly be said to pay by reason of liability imposed by law unless an actual liability at law causes it to make the payment. The Policy uses the expression "alleged liability" often but not in Article I.

27.   "*Ultimate Net Loss*" means "*the total sum which the Insured shall become obligated to pay for Damages on account of Personal Injury...* " That too is dealing with a sum which the insured is obliged to pay, which is consistent with an actual liability. "*Damages*" means "*all forms of compensatory damages etc ... which the Insured shall be obligated to pay by reason of judgment or settlement for liability on account of Personal Injury...* " Damages are not defined simply by reference to a judgment or

settlement but to a judgment or settlement "*for liability*", which must, in context, mean an actual liability. Personal Injury is a defined term which does not include alleged injuries. Alleged Personal Injury is referred to elsewhere but not in Article I. In addition Damages are not payable by reason of liability imposed by law for anything other than actual personal injuries.

*AZICO's submissions*

28.    Mr Stanley submits that this analysis, which reflects that of the judge, is erroneous. It rests on and starts with, a fallacious working assumption that liability means actual liability, when the provisions of the Policy should be looked at iteratively and as a whole; and it ignores or gives far too little weight to the fact that everything within the Coverage clause has to be "*encompassed by an Occurrence*". Taken as a whole the Policy does not require the insured to demonstrate actual liability, if it is established by a judgment or an approved settlement. An Occurrence is the first step on the route to recovery and defines the scope of the coverage. It is apparent from the definition of Occurrence, which is peppered with references to "*actual or alleged*" that it embraces alleged matters. By way of example, Definition V (2) which deals with an Integrated Occurrence contemplates an *alleged* personal Injury, which is *allegedly* attributable to an *alleged* event. Thus consequence, causation and cause can all be alleged.

29.    Against that background everything else falls into place. Article I means (collapsing, so far as possible the definitions into the Article) that the indemnity is against Ultimate Net Loss (i.e. the total sum which the insured has to pay by reason of judgment or settlement) by reason of liability imposed by law, being a judgment or settlement for liability on account of Personal Injury covered by the Policy encompassed by an Occurrence, providing that the requisite notice has been given. An Occurrence covers matters that are alleged as well as actual.

30.    The cover is, thus, against whatever is adjudged due or is paid in settlement in respect of an alleged Personal Injury when the judgment or settlement is in respect of a tortious claim. The words "*by reason of liability imposed by law*" refer to the type of liability in question. The expression "*shall be obligated to pay by reason of judgment or settlement for liability*" is well able to cover a settlement in respect of the liability asserted by the claimant.

31.    Mr Stanley stopped short of contending that the cover under the Policy was in respect of alleged liability. He submitted that the cover was in respect of actual liability; but that the parties to the Policy had in the Loss Payable clause provided the means by which, as between themselves, the existence of actual liability should be determined or established. Under that clause liability under the Policy does not attach unless and until:

> "*the Insured's liability covered hereunder shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by settlement approved in writing by the Company, and the Insured shall have paid such liability.*"

If there was a final judgment against the Insured or (as here) a settlement approved in writing by the Company "*the Insured's liability covered hereunder*" is treated as

fixed and rendered certain. In other words, as between the insured and the insurer, actual liability is established and determined.

*Discussion*

*Occurrences*

32.   These submissions were ably presented but I cannot accept them. The liability which is the subject of Coverage under Article I must be "*encompassed by an Occurrence*". There has, therefore, to be an Occurrence. This may be an actual or alleged Personal Injury, which is actually or allegedly attributable to an actual or alleged event. But the Policy does not provide cover for Occurrences. The Occurrence is the shell within which the pearl of liability must be found; or, to use the metaphor adopted by the judge, the Occurrence is the gateway to coverage. What the Occurrence does not do is to identify that which is to be the subject of indemnity. In **Yorkshire Water v Sun Alliance** [1997] 2 Lloyd's Rep 21, this Court exposed the fallacy of treating an "event" or an "occurrence" as the peril insured against.

33.   The reason for the encompassing phraseology lies in the nature of the Policy. It responds when events of a particular character have happened and notice thereof has been given. Thus, in relation to an Integrated Occurrence, Personal Injuries attributable to the same event or alleged Personal Injuries allegedly attributable to the same alleged event can be notified. This enables the insured to give notice of what may turn out to be actual liability for actual Personal Injury actually caused by an actual event, when, at the time when the notice is given, it is likely to be unclear whether, and, if so, to what extent, there are or will be actual Personal Injuries. If notice could only be given of what was *in fact* the position the insured might well be unable to justify giving a notice which could only truthfully be given on the basis of what was *alleged*. AZ might not, therefore, be able properly to give any notice at all if it could not be satisfied that, say, the claimants had actually contracted diabetes as a result of the use of its Seroquel.

34.   Mr Stanley submits that this is an illusory concern because, even if Occurrence only included actual Personal Injury, AZ could legitimately give notice even it did not believe or was not sure that there was any actual Personal Injury. If it turned out that there was, it would not matter that when the notice was given, the injury was only alleged. I doubt this and, in any event, it would not seem to me appropriate, on this hypothesis, to adopt a construction which contemplates that AZ should give a notice of a fact which it does not believe to be true.

35.   Further, if Occurrence was limited to actual Personal Injuries, it would make Article V A – which provides that if any Executive Officer becomes aware of an occurrence likely to involve the Policy the Named Insured shall, as a condition precedent to the rights of any Insured under the Policy, give written notice to the Company as soon as practicable and in any event during the Policy Period – difficult to apply since it must be highly debatable in many instances whether AZ has become aware of an actual as opposed to an alleged Personal Injury.

36.   Again, under Article V B an insured can give a Permissive Notice of an Occurrence during the Policy Period. Decisions on whether to do so, and whether to give notice of any Occurrence as an Integrated Occurrence, in order to be able to aggregate Personal

Injuries, have, thus, to be taken during the Policy period at which time it is inherently likely that the existence of *actual* physical injury and its *actual* cause is not known. In those circumstances practical commercial considerations require there to be an ability to give notice of allegations.

37.     The fact that an Occurrence may involve matters which are only alleged does not, however, mean that there is cover against that which is alleged, if there is no actual liability. To treat the phrase "*encompassed by an Occurrence*" as providing the key to what is covered takes wholly inadequate account of the previous words of Article I, which are the operative definition of cover, in favour of words whose function (at the tail end of the Article) is not to signify that Occurrences are covered but to indicate that there can be no cover for liability if the liability does not fall within an Occurrence of which notice has been given as provided for by the Policy. Noticeably Personal Injuries for which cover is provided do not, as I have said, include alleged personal injuries.

38.     In addition I cannot accept that when the Policy refers to amounts paid "*by reason of liability imposed by law*" it means liability, whether actual or alleged, of a type which the law imposes, whether or not it actually does so. In agreement with the judge I regard the words "*pays by reason of liability ...imposed by law*" as indicating that there has to be a causal link between what is paid and an actual legal liability, and the words "*shall be obligated to pay by reason of judgment or settlement for liability*" in the definition of Damages as denoting the existence of an actual liability at law which obliges that payment.

*Considerations said to support the primary argument*

39,     Mr Stanley relied on a number of other matters as supporting his primary argument. The first was that "*Advertising Liability*" was defined to mean:

> "*liability for Damages on account of (1) libel, slander or defamation* [and various matters] *committed or* alleged *to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the Insured's advertising activities...*"

This was said to indicate that the Policy provided cover for alleged Advertising Liability, which supported the suggestion that it provided cover for alleged Personal Injuries as well.

40.     I do not accept this. I entertain some doubt as to whether, as the judge thought, "alleged" in the definition of Advertising Liability relates solely to the words which followed ("*to have been committed in any advertisement etc..*"). But, even if they also relate to that which precedes them ("*libel, slander or defamation*"), the wording is not apt to convert the Coverage clause into a clause providing indemnity in respect of an alleged liability either in relation to Advertising Liability or, *a fortiori*, in relation to Personal Injury, in the definition of which there is no reference to alleged personal injury.

41.     The second matter relied on is the reference in the definition of Product Pollution Liability which refers to "*liability or* alleged *liability*" for Personal Injury or Property Damage which fulfils certain characteristics.

42.     Production Pollution Liability operates as an exclusion to an Exclusion. Article IV
        EXCLUSIONS provides that the Policy does not apply to Pollution, as defined in
        Exclusion K (1) (as well as other matters). Paragraph K (2) then provides that
        paragraph K (1) does not apply to, *inter alia*, Production Pollution Liability and, in
        effect, writes such Liability back in.

43.     The judge regarded the use of "actual or alleged" in the context of such a write back
        as readily understandable. He did so, because, as he pointed out, the opening words of
        Article IV provide that the Policy does not apply to a series of actual or alleged
        matters. Exclusion F (1) excludes Advertising Liability arising out of breach of
        contract but then provides that that paragraph shall not exclude liability "*for
        unauthorised misappropriation of advertising ideas based upon breach or alleged
        breach of an implied contract*". Exclusion I excludes liability arising out of the design
        manufacture etc. of any Aircraft but this is not to apply to any liability or alleged
        liability in respect of certain matters. Exclusion K in respect of Pollution has the write
        back in respect of Product Pollution Liability referred to in the preceding paragraph.
        The opening words of Article IV are wider than are necessary to provide that the
        matters excluded are not the subject of the coverage. They indicate that the matters
        excluded do not count for any policy purpose. They cannot, therefore, form part of a
        Notice of Occurrence or an Integrated Occurrence, which include both actual and
        alleged matters. It is not, therefore, surprising to find references to alleged matters in
        the Exclusions. Article IV serves to confirm that it is only possible to include in a
        Notice of Occurrence something which, if it results in actual liability, will be a
        liability covered by the Policy.

44.     I agree.

45.     There are other exclusions which cover alleged matters. Thus Exclusion N ERISA
        includes "*liability or alleged liability under the Employee Retirement Income Security
        Act of 1974*". Exclusion O REPETITIVE STRESS includes "*carpal tunnel syndrome
        arising or allegedly arising from ... use of keyboards or finger pads*". Exclusion P
        SECURITIES, ANTITRUST ETC includes "*liability or alleged liability arising out of
        employee, officer or director dishonesty*". These exclusions do not have a write back;
        but, again, given that an Occurrence can include alleged matters and given the
        opening words of Article IV, and their function, the reference to alleged natters is not
        surprising.

46.     A similar analysis can be made in relation to the definition of Expected or Intended.
        Personal Injuries are said by Definition L to be Expected or Intended where, *inter
        alia*, actual or alleged Personal Injury is expected or intended by an Insured. The
        definition of Occurrence in Definition V (2) provides for the aggregation of Personal
        Injuries where there is an Integrated Occurrence "*provided ... that any actual or
        alleged Personal Injury ....which is Expected or Intended by any Insured shall not be
        included in any Occurrence.*" Here the reference to actual or alleged Personal Injury
        is entirely understandable since Personal Injury which is Expected or Intended is
        excluded from an Occurrence which itself is defined by reference to matters which are
        either actual or alleged.

47.     I regard this analysis as providing an acceptable explanation for the presence of
        "alleged" in the places identified. In any event I agree with the judge that the
        references to "alleged" in the Exclusions (which are not uniform – there is none in

paragraph (2) (b) of the Pollution Exclusion) are wholly insufficient to signify that the coverage provided by Article I is, despite (i) its language, (ii) the English law context in which it sits, and (iii) the absence in it of any reference to "alleged", to be treated as covering something other than actual liability.

48. Some reliance was placed on the Cross Liability clause in Article VI with its reference to a Claim suffered by an employee of one Insured for which another Insured is or may be liable. This provision does not deal with coverage at all. It provides that if an employee of Company X suffers Personal Injury and a Claim is made against Company Y, both X and Y being Insureds, Y is covered in the same way as if there was a separate policy issued to Company Y. In that event Company Y would still have to establish actual liability.

49. Reliance was next placed on Article VI E – the Appeals Provision – which entitles AZICO to launch an appeal. That provision, also, does not address any question of coverage. Nor can it be regarded as otiose if the Policy requires the insured to establish actual liability. An existing judgment may not necessarily establish actual liability but it may be compelling evidence of it, of which the Insurer might well wish to rid itself.

50. Lastly, under this heading, reliance was placed on Article VI Q – the Policy Extensions clause, which provides:

> "*Subject to Condition L, Coverage A of this Policy may be extended at the expiration of each Annual Period for another Annual Period, subject only to agreement between the Company and the Named Insured as to the applicable premium and such other terms and conditions as the Company and the Named Insured may mutually deem appropriate. Coverage A shall expire at the end of an Annual Period if not extended (or upon cancellation thereof). Where Coverage A (or Coverage B) is cancelled or not extended, such cancellation or non-extension shall not affect the rights of the Insured as respects any Occurrence or Integrated Occurrence of which notice was given in accordance with the provisions of this Policy prior to such cancellation or non-extension and shall not limit whatever rights the Insured otherwise would have under this Policy as respects actual or alleged Personal Injury, Property Damage or Advertising Liability included in such Occurrence or Integrated Occurrence taking place subsequent to such cancellation or non-extension.*"

51. Again the provision is entirely understandable in circumstances where Occurrences may include alleged matters. It is also clear from the words "*shall not limit whatever rights the Insured otherwise would have under this Policy as respects etc....*" that it is not creating coverage.

52. We were urged to interpret the Policy in the light of commercial considerations, and, in particular, the difficulty in which AZICO would be placed if it had to establish actual liability to 30,000 or more claimants and the likely need, from AZ's point of view, to enter into settlements which recognised the risks of litigation rather than the extent of actual liability if properly considered in the light of the actual facts and the applicable law. I do not underestimate the difficulties AZ and others like them face in dealing with tort litigation in the United States. At the same time the issues with which AZ would have to deal in such litigation (e.g. was there personal injury,

causation, and fault?) are the same as those which would arise in proving actual liability in any claim against the insurers. Moreover the fact that it may have been eminently sensible in commercial terms to settle with claimants for modest sums, albeit after very considerable Defense Costs, and potentially prejudicial to the making of any such settlement if it were to become known that AZ was asserting to insurers that it was actually liable, cannot change the nature of the Policy for which AZ bargained.

*The Loss Payable clause*

53.   The Loss Payable clause does not, in my judgment, provide that actual liability of the insured to claimants is to be taken as established if there is a judgment against the insured or a settlement approved in writing by the insurer. This is for a number of reasons.

54.   First, the clause does not say that.

55.   Second, the Loss Payable clause would be an odd, albeit not impossible, place in which to find such a provision which belongs more appropriately as part of, or an adjunct to, the Coverage clause.

56.   Third, the function of the clause is indicated by its heading of "*Loss Payable*", namely to specify when a liability covered by the Policy is to be paid. What liability is covered by the Policy is determined earlier, in the Coverage clause. It is not determined by the Loss Payable clause.

57.   Fourth, AZICO treat the words "*the Insured's liability covered hereunder shall have been fixed and rendered certain either by final judgment or by settlement...*" as showing that in those events liability is treated as having been shown to exist. Mr Stanley accepted that the wording did not operate to foreclose any question of whether or not the liability established by the judgment or settlement fell within the coverage of the Policy. He suggested that the phrase should be read as if it said something like "the insured's liability covered hereunder (if it is covered)". But, if coverage is not to be treated as established by the judgment, I do not see why liability should be treated as established either.

58.   In my view the phrase is dealing with a presupposed "*liability covered hereunder*" and provides that, if there is such a liability, the loss is payable when the amount of that liability has been fixed and rendered certain by the judgment or settlement – language which, itself, is more consistent with the ascertainment of loss and the temporal attachment of the Policy rather than the existence of liability. Whether or not there is a "*liability covered hereunder*" depends on whether there is actual liability and whether that liability is one which falls within the terms of the cover. A distinction is to be made between provisions which relate to the time when a loss in respect of a liability covered by the policy is payable, or during which a loss must occur or a claim be made if the policy is to respond, on the one hand, and those which relate to the peril insured against, on the other: see **MDIS v Swinbank** [18] – [25]; **Thornton Springer v NEM** [33] – [35].

59.   Fifth, the operation of the clause in the manner contended for by AZICO does not appear to work in the case of a settlement. Most settlements do not contain an

admission of liability. Many are made with an express non admission, or a denial, of liability. It is difficult to see how a settlement that in terms did not admit, or denied, liability could be taken as establishing that liability existed.

60. Sixth, the clause provides that:

> "*The Company may examine the underlying facts giving rise to a judgment against or settlement by the Insured to determine if, and to what extent, the basis for the Insured's liability under such judgment or settlement is covered by this Policy*".

61. Mr Stanley submits that, whilst this clause entitles the insurer to examine whether the judgment against the insurer is within the coverage of the policy, it does not extend to allowing the insurer to contend that the insured was never liable at all. I do not agree. The provision is not by its terms limited to entitling the insurer to examine the judgment or settlement to determine if and to what extent the basis for it (as revealed in the judgment or settlement) is covered by the policy. It extends to entitling the insurer to examine "*the underlying facts giving rise to the judgment or settlement*", which must envisage the actual underlying facts. That examination may include, as it seems to me, seeing whether, for example, the claimant did in fact suffer personal injury and whether that was in fact caused by some tortious failure on the part of the insured. Examination of the underlying facts may show that the basis of the judgment was that the judge thought that the insured was liable when in fact or in law it was not – either because he or she was misled as to the existence of personal injury, causation or negligence or because his analysis was legally fallacious or factually in error; or that the basis of settlement was in respect of an alleged liability when in truth there was none.

62. Seventh, this argument is similar to an argument rejected by Aikens J in **Enterprise Oil** [64] – [73], in circumstances more favourable to its acceptance than in the present case.

63. Lastly, looking at the question more generally, it is relevant to observe that, had a draftsman, cognizant of English law, intended the position to be as AZICO contends it to be, it is difficult to accept that he would have left his intention to be discerned by the sort of analysis upon which AZICO relies.

64. Accordingly the judge was, in my judgment, right in the conclusion that he reached, which I have set out in paragraph 10 above.

65. The judge did not in terms consider, nor, in my judgment was it necessary for him to consider, the second half of the first issue namely the words :

> "*so that the Insurer would always be entitled to refuse to approve settlement (or, 'would not be bound to approve settlement', being the formulation suggested by the Reinsurers) when the Insured does not assert (or, 'assert and prove', being the formulation suggested by the Claimant) that it would, on a balance of probabilities, have been liable for the claims in question*"

66. This formulation, which was adopted because this is a dispute between insurers and reinsurers, ties in with a submission made by Mr David Edwards, QC for the

reinsurers, that, even if AZICO was right to say that the effect of a settlement approved by the insurers was to establish that the insured was actually liable to the relevant claimants, AZICO would have no claim. In his submission, on this hypothesis the liability of the insured would only have arisen because the insurers had chosen to consent to the settlement. In so doing they would have given up a defence open to them, namely that there was no actual liability. Whilst they were entirely at liberty to do that for themselves, it was not open to them to give up a defence available and claim against the reinsurers in consequence.

67.   He relied in this respect on the words of Mr Justice Lawrence in **Re London County Commercial Reinsurance Office** [1922] 2 Ch 67:

> "*The fact that the policies are reinsurance policies and that the reassured have paid under the policies which they have issued does not in my judgment operate to enable them to substantiate their claims against the company. It is well settled that, subject to any provisions to the contrary in the reinsurance policy, the reassured, in order to recover from their underwriters, must prove the loss in the same manner as the original assured must have proved it against them, and the reinsurers can raise all defences which are open to the reinsured against the original insured. This is equally true whether the reinsured had or had not paid their assured, in as much as it would be inequitable for them to renounce any of their defences so as to prejudice the reinsurers.*"

68.   Mr Edwards accepted that there might be an obligation on the part of the insurers to act reasonably but, in circumstances where AZ did not assert that they were in fact liable to those who were claiming against them, and AZICO did not think that they were, there would have been nothing unreasonable in AZICO declining to consent. If it were otherwise, and if, as AZICO contends, consent to settlement establishes liability, the position would be perverse. AZICO, which does not accept liability, would be bound to consent to a settlement which established that it existed. If consent would have that consequence it could not be right that AZICO was entitled to prejudice the reinsurers by giving it.

69.   In response Mr Stanley submitted that there was in the present case no abandonment of a defence but, rather, the exercise of a discretion which could not be treated as irrational and was, therefore, valid.

70.   In view of my decision on the first issue I do not regard it as necessary to determine this controversy; nor is it appropriate to do so for a number of reasons. First, it was not addressed by the judge. Second, the extent to which an insurer or a reinsurer is bound to exercise a discretion as to whether to give consent is a matter upon which we had only very limited submissions. Mr Stanley referred en passant to **Gan Insurance Co Ltd v Tai Ping Insurance Co Ltd** [2001] EWCA Civ 1047, although he did not cite it. That was a case concerning a reinsurer in which Mance LJ (as he then was) considered the extent to which reinsurers might withhold approval of a settlement in terms which suggested that they would be entitled to do so provided that they were acting in good faith and not irrationally.

71.   I would not, however, wish to express an obiter view on the subject without more focused submission on the extent of, and the limitations upon, the exercise of

discretion. It is also debatable whether the principle in **Re London County Commercial** applies where an insurer has exercised a discretion in good faith and not irrationally, when he could also have exercised it the other way. I would prefer to leave that debate to a case where it matters (because the cover is not limited to actual liability); where the issue has been considered at first instance; and where it has been the subject of more extensive submission than we have had.

*Issue 2    Defense Costs*

72.    In English law there is, in respect of non-marine liability insurance, no right to recover Defense Costs. The Policy says in terms and in capital letters that the Company has no duty to defend and that *"Defense Costs covered by this policy are included within and not in addition to the limits of liability of this policy"*. Condition D (1) also makes clear that there is no duty to assume charge of the defence or settlement of any Claim against the Insured. So, as the judge observed, any entitlement to recover Defense Costs must depend on some free-standing entitlement under the Policy.

73.    Insofar as the Policy deals with Defense Costs it is badly drafted. On a literal reading Defense Costs can never be recovered. This is because the insured's Defense Costs will never be incurred by reason of a liability imposed by law nor are they sums which the insured will be obligated to pay by reason of a judgment or settlement. They will be sums which are due pursuant to the contract between the insured and its lawyers.

74.    The parties plainly intended that Defense Costs should be recoverable in some circumstances. Mr Geraint Webb QC for AZICO urged upon us what he described as the commercial realities facing companies such as AZ. Claims are often made in jurisdictions which are favourable to would-be claimants where there is trial by jury under minimal judicial direction. That circumstance together with the number of such claims frequently makes it imperative, or at least highly desirable, to reach a settlement, notwithstanding the merits of the defence. The fact that the case, if tried, will be tried by a jury, probably sympathetic to claimants, means that a dubious claim may well succeed. The more there are of such claims the more likely is it that at least some of them will do so. Even a small proportion of a total of 30,000 or more claims is sizeable. In some cases punitive damages may be available. Against that background the parties to the Policy must have intended that the insurers would bear the Defense Costs in respect of the defence, particularly the successful defence (or one that results in a modest settlement) of actual or anticipated Claims.

75.    That would be a desirable result from AZ's point of view. But there is no provision in the Policy which stipulates that AZICO will pays the Defense Costs of Claims, which are defined as meaning "*an oral or written demand against an Insured for Damages and includes the threat or initiation of any suit or arbitration proceedings or a request for a tolling agreement*". Nor, in my view, can such a provision be implied.

76.    In those circumstances the only way, consistent with the Policy wording, to ensure that Defense Costs are recoverable in some circumstances, as the Policy plainly contemplates, is to treat them as parasitical on Damages. This is what the Policy does since the only words providing for the recovery of Defense Costs are the last five words of the definition of Damages. The effect of this is, as it seems to me and as the

judge has held, that AZ recovers its Defense Costs if it establishes that it was or would have been liable for damages in respect of the claim in question; but not otherwise.

77.  The words dealing with Defense Costs are, as Mr Stanley put it below, an untidy bolt on. But that does not mean that they can be regarded as providing a free standing coverage for Defense Costs in relation to any Claim. Such an interpretation divorces the words "*and shall include Defense Costs*" from the Damages in which they are to be included; and the fact that they are to be so included means that, in order to recover them, there must be a liability imposed by law for Damages, which, for the reasons I have given, means an actual liability.

78.  Even if the words "*and shall include Defense Costs*" could be released from the Damages of which they are said to be a part, there is no provision in the Coverage clause or in any other clause which provides, without more ado, that AZICO will pay them. Nor can any process of interpretation create a freestanding entitlement to an indemnity in respect of Defense Costs in respect of an alleged liability.

79.  The fact that Defense Costs include the costs of defending anticipated Claims does not advance the position. That provision precludes any argument that Defense Costs are irrecoverable because they were incurred at a time when the actual claim had not been made. But the definition does not extend the scope of the coverage to claims which are not in respect of actual liabilities. Coverage is determined by Article I, which is not concerned with alleged as opposed to actual liabilities.

80.  This means that AZ does not recover if it successfully defends a claim. This is surprising and from the point of view of AZ, profoundly unsatisfactory. It is, however, as it seems to me, the result of having Defense Costs only catered for, and then maladroitly, by way of treating then as an addition to and an element of Damages.

81.  It is no doubt unusual for Defense Costs only to be recoverable in the event of an unsuccessful defence. But it is not unheard of. As para 20-047 of **Colinvaux's Law of Insurance, 9th Edition,** records:

> "*Contractual provisions for the payment of Defence Costs vary. Some state that the insurers are not under any obligation to fund Defence Costs and that the assured is entitled to a reimbursement of Defence Costs only if the assured is ultimately found to be liable on grounds which fall within the scope of the policy, in particular the assured as not dishonest*".

Reference is made to two US authorities. At para 20-048 there is the following paragraph:

> "*It is possible to draft wording which confines recovery of Defence Costs to cases in which the assured is actually liable to the third party so that there is a substantive claim against the insurers, although that type of wording is relatively rare in liability insurance*".

*General considerations*

82.     The result is very unfavourable to the insured. So is the provision that the loss is not payable unless and until there has been a judgment or a settlement approved by the insurer. This provision, which would be applicable whether or not a judgment against the insured or a settlement approved by the insurer "establishes" liability for the purpose of the insurance, has the effect that it is not open to the insured (against whom there has been no judgment and no settlement approved by the insurer) itself to settle with the claimants and contend, later, that it was actually liable. In addition the Loss Payable clause requires the insured to have paid the claim before it can recover. The Policy is not, therefore, to be treated as one whose terms are intended to be particularly favourable to the insured.

83.     In my judgment the judge gave the right answer on both issues. Accordingly I would dismiss the appeal.

        LORD JUSTICE BRIGGS

84.     I agree.

        LORD JUSTICE MOORE-BICK

85.     I also agree.

APPENDIX

"**NOTICE**

THE COMPANY DOES NOT HAVE ANY DUTY TO DEFEND. DEFENSE COSTS COVERED BY THIS POLICY ARE INCLUDED WITHIN AND ARE NOT IN ADDITION TO THE LIMITS OF LIABILITY OF THIS POLICY.

**INSURING AGREEMENTS**

## I COVERAGE

Zeneca Insurance Company (the "**Company**") shall, subject to the limitations, terms, conditions and exclusions below, indemnify the **Insured** for **Ultimate Net Loss** the **Insured** pays by reason of liability:

(a) imposed by law, or

(b) of a person or party who is not an **Insured** assumed by the **Insured** under contract or agreement,

for **Damages** on account of:

(i) **Personal Injury**

(ii) **Property Damage**

(iii) **Advertising Liability**

encompassed by an **Occurrence,** provided:

**COVERAGE A**: notice of the **Occurrence** shall have been first given by the **Insured** in an **Annual Period** during the **Policy Period** in accordance with Article V of this Policy,

or

**COVERAGE B:** notice of the **Occurrence** shall have been first given during the **Discovery Period** in accordance with Article V of this Policy, but only if the **Discovery Period** option has been elected in accordance with the provisions of this Policy.

## III DEFINITIONS

A. "**Advertising Liability**" means liability for **Damages** on account of:

(1) libel, slander or defamation,

(2) any infringement of copyright or of title or of slogan,

(3) piracy or misappropriation of ideas under an implied contract, or

(4) any invasion of right of privacy,

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the **Insured's** advertising activities.

G. "**Damages**" means all forms of compensatory damages, monetary damages and statutory damages, punitive or exemplary damages and costs of compliance with equitable relief, other than governmental (civil or criminal) fines or penalties, which the **Insured** shall be obligated to pay by reason of judgment or settlement for liability on account of **Personal Injury, Property Damage** and/or **Advertising Liability** covered by this Policy, and shall include **Defense Costs**.

H. "**Defense Costs**" means reasonable legal costs and other expenses incurred by or on behalf of the **Insured** in connection with the defense of any actual or anticipated **Claim**, including attorneys' fees and disbursements, law costs, premiums on attachment or appeal bonds, pre-judgment and post-judgment interest, expenses for experts and for investigation, adjustment, appraisal and settlement, excluding the salaries, wages and benefits of the **Insured's** employees and the **Insured's** administrative expenses.

R. "**Integrated Occurrence**" means an **Occurrence** encompassing actual or alleged **Personal Injury, Property Damage** and/or **Advertising Liability** to two or more persons or properties which commences over a period longer than thirty (30) consecutive days which is attributable directly, indirectly or allegedly to the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such; provided, however, that such **Occurrence** must be identified in a notice pursuant to Section C of Article V as an "**Integrated Occurrence**" and is subject to all provisions of paragraphs (1) and (2) of Definition V.

V. (1) An "**Occurrence**" exists if, and only if:

(a) except with respect to actual or alleged **Personal Injury** or **Property Damage** arising from the **Insured's Products**, there is an event or continuous, intermittent or repeated exposure to conditions which event or conditions commence on or subsequent to the **Inception Date**, or the **Retroactive Coverage Date**, if applicable, and before the **Termination Date** of Coverage A, and which cause actual or alleged **Personal Injury, Property Damage** or **Advertising Liability**;

(b) actual or alleged **Personal Injury** to any individual person, or actual or alleged **Property Damage** to any specific property, arising from the **Insured's Products** takes place on or subsequent to the **Inception Date**, or the **Retroactive Coverage Date**, if applicable, and before the **Termination Date** of Coverage A.

(2) Except as provided in paragraph (3) below, where an **Occurrence** exists and a series of and/or several actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** occur which are attributable directly,

indirectly or allegedly to the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such, all such actual or alleged **Personal Injuries**, **Property Damages** and/or **Advertising Liabilities** shall be added together and treated as encompassed by one **Occurrence** irrespective of the period (but without limiting the effect of Exclusion IV.A) or area over which the actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** occur or the number of such actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities**; provided, however, that any actual or alleged **Personal Injury, Property Damage** or **Advertising Liability** which is **Expected or Intended** by any **Insured** shall not be included in any **Occurrence**. So far as **Personal Injuries, Property Damages** and/or **Advertising Liabilities** resulting or alleged to result from the design, formulation, manufacture, distribution, use, operation, maintenance and/or repair of an **Insured's Product**, and/or the failure to warn as to the use, operation, maintenance and/or repair of an **Insured's Product**, the term "the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such" means any such design, formulation, manufacture, distribution, use, operation, maintenance, repair and/or failure to warn, as the case may be, as to which such losses, injuries or damages are directly, indirectly or allegedly attributable. As respects **Advertising Liability**, multiple or repeated broadcasts or publications of the same or similar materials shall constitute "the same actual or alleged event, condition, cause or defect."

(3) Notwithstanding paragraphs (1) and (2) above, if an **Occurrence** is not identified in the notice thereof as an "**Integrated Occurrence**," then actual or alleged **Personal Injury** to each person, **Property Damage** to each piece of property and/or **Advertising Liability** which commences at any time shall be deemed to be encompassed within a separate **Occurrence** from which **Personal Injury** to any other person, **Property Damage** to any other piece of property and/or **Advertising Liability** which commences more than thirty (30) days prior or later thereto is encompassed.

W. "**Personal Injury**" means **Bodily Injury**, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation, and libel, slander or defamation of character or invasion of rights of privacy.

Z. "**Product Pollution Liability**" means liability or alleged liability for **Personal Injury** or **Property Damage** arising out of the end-use of the **Insured's Products**, if such use occurs after possession of such goods or products has been relinquished to others by the **Insured** or by others trading under its name and if such use occurs away from premises owned, rented or controlled by the **Insured;** such goods or products shall be deemed to include any container thereof other than an **Automobile, Watercraft or Aircraft**.

AA. "**Property Damage**" means:

(1) physical damage to or destruction of tangible property, including the loss of use thereof at any time resulting therefrom;

(2) loss of use of tangible property which has not been physically damaged or destroyed arising from physical damage to or destruction of other tangible property; or

(3) losses consequent upon evacuation arising from actual or threatened **Bodily Injury** or destruction of tangible property.

AD. **"Ultimate Net Loss"** means the total sum which the **Insured** shall become obligated to pay for **Damages** on account of **Personal Injury, Property Damage** and/or **Advertising Liability** which is, and/or but for the amount thereof would be, covered under this Policy less any salvages or recoveries.

## IV EXCLUSIONS

This policy does not apply to actual or alleged:

### A. PRIOR TO INCEPTION OR RETROACTIVE COVERAGE DATE

**Personal Injury** to any individual person, **Property Damage** to any specific property or **Advertising Liability** which takes place prior to the **Inception Date** or, if applicable, the **Retroactive Coverage Date**.

### F. ADVERTISING

**Advertising Liability** arising out of:

(1) breach of contract, but this paragraph (1) shall not exclude liability for unauthorized misappropriation of advertising ideas based upon breach or alleged breach of an implied contract;

(2) infringement of registered trademarks, service marks or trade name by use thereof, but this paragraph (2) shall not apply to titles or slogans;

(3) the failure of goods, products or services to conform with advertised quality or performance;

(4) the wrong description of the price of goods, products or services; or

(5) advertising activities on behalf of a party other than an **Insured** by an **Insured** engaged in the business of advertising.

### I. AIRCRAFT

Liability arising out of the design, manufacture, construction, maintenance, service, use or operation of any **Aircraft** or any component part of or equipment thereof or any other **Aircraft** navigational or related equipment or service, including, without limitation, liability arising from a crash or

hijacking; provided, however, that this Exclusion I shall not apply to any liability or alleged liability in respect of:

(1) **Aircraft** fuelling and related operations with respect to **Personal Injury** or **Property Damage** occurring at the time of such operations, i.e., while the **Aircraft** involved is on the ground and motionless;

......

## K. POLLUTION

(1) (a) liability for **Personal Injury**, **Property Damage** or **Advertising Liability** arising out of the **Discharge** of **Pollutants** into or upon land or real estate, the atmosphere, or any watercourse or body of water whether above or below ground or otherwise into the environment; or

(b) liability, loss, cost or expense of any **Insured** or others arising out of any direction or request, whether governmental or otherwise, that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

This Exclusion K applies whether or not such **Discharge** of such **Pollutants**:

(i) results from the **Insured's** activities or the activities of any other person or entity;

(ii) is sudden, gradual, accidental, unexpected or unintended; or

(iii) arises out of or relates to industrial operations or the **Waste** or by-products thereof.

(2) Paragraph (1) of this Exclusion K does not apply to:

(a) **Product Pollution Liability**; or

(b) (i) liability of the **Insured** for **Personal Injury** or **Property Damage** caused by an intentional **Discharge** of **Pollutants** solely for the purpose of mitigating or avoiding **Personal Injury** or **Property Damage** which would be covered by this Policy; or

(ii) liability of the **Insured** for **Personal Injury** or **Property Damage** caused by a **Discharge of Pollutants** which is not **Expected** or **Intended**, but only if the **Insured** becomes aware of the commencement of such **Discharge** within seven (7) days of such commencement;

provided that the **Insured** gives the **Company** written notice in accordance with Section D of Article V of this Policy of such commencement of the **Discharge** under subparagraphs (2)(b)(i) or (ii) of this Exclusion K within forty (40) days of such commencement. Such notice must be provided irrespective of whether notice as soon as practicable otherwise would be required pursuant to Section A of Article V of this Policy.

## V NOTICE OF OCCURRENCE

## A. NOTICE AS SOON AS PRACTICABLE

If any **Executive Officer** shall become aware of an **Occurrence** likely to involve this Policy, the **Named Insured** shall, as a condition precedent to the rights of any **Insured** under this Policy, give written notice thereof to the **Company** in the manner provided in Section D of this Article V.

Such notice shall be given as soon as practicable and, in any event, during the **Policy Period** or the **Discovery Period**, if applicable, and in accordance with Paragraph 2(b) of Exclusion K, if applicable. Failure to provide written notice as prescribed above shall result in a forfeiture of any rights to coverage hereunder in respect of such **Occurrence**.

## B. PERMISSIVE NOTICE

Any **Insured** may at any time during the **Policy Period** or **Discovery Period** give notice of an **Occurrence** to the **Company** in the manner provided in Section D of this Article V.

## C. PERMISSIVE NOTICE OF INTEGRATED OCCURRENCE

The **Insured** may at its option give written notice to the **Company** of any **Occurrence** as an "**Integrated Occurrence**" by designating it as such and giving such notice in the manner provided in Section D of this Article V. Once the **Insured** gives **Notice of Integrated Occurrence**, all **Personal Injury** or **Property Damage** that falls within the **Integrated Occurrence** (as provided in the terms, conditions and exclusions of this Policy) shall be treated as such for all purposes under this Policy irrespective of whether this Policy has been terminated after the **Insured** has given **Notice of Integrated Occurrence**. The limit of liability applicable to such **Integrated Occurrence** shall be the limit described in Article II of this Policy.

## VI CONDITIONS

## C. CROSS LIABILITY

In the event of a **Claim** being made by reason of **Personal Injury** suffered by an employee of one **Insured** hereunder for which another **Insured** hereunder is or may be liable, this Policy shall cover such **Insured** against whom such a **Claim** is made or may be made in the same manner as if separate policies had been issued to each **Insured** hereunder.

Nothing contained herein shall operate to increase the **Company's** limits of liability as set forth in Item 2 of the Declarations.

## D. ASSISTANCE AND COOPERATION

(1) The **Company** shall not be called upon to assume charge of the settlement or defense of any **Claim** made or suit brought or proceeding instituted against an **Insured**, but the **Company** shall have the right and shall be given the opportunity to associate with the **Insured** or the **Insured's** underlying insurers or both in the defense and control of any **Claim**, suit or proceeding relative to

any **Occurrence** where the **Claim** or suit involves, or appears reasonably likely to involve, the **Company**, in which event the **Insured** and the **Company** shall cooperate in all things in the defense of such **Claim**.

(2) The **Insured** shall furnish promptly all information reasonably requested by the **Company** with respect to any **Occurrence**, both with respect to any **Claim** against the **Insured** and pertaining to coverage under this Policy.

(3) If liabilities, losses, costs and/or expenses are in part covered by this Policy and in part not covered by this Policy, the **Insured** and **Company** shall use their best efforts to agree upon a fair and proper allocation thereof between covered and uncovered amounts, and the **Insured** shall cooperate with such efforts by providing all pertinent information with respect thereto.

(4) Those expenses incurred by the **Company** on its own behalf in connection with claims representation pursuant to this Condition D shall be at its own expense and shall not be part of **Ultimate Net Loss**.

## E. APPEALS

In the event the **Insured** or the **Insured's** underlying insurers elect not to appeal a judgment in excess of the retention or the underlying limits, as the case may be, the **Company** may elect to make such appeal at its own cost and expense and shall be liable for the taxable costs and disbursements of such appeal and post-judgment interest on the judgment appealed from accruing during such an appeal. In no event, however, shall liability of the **Company** for **Ultimate Net Loss** exceed the applicable limit of liability plus the costs and expenses of such appeal.

## F. LOSS PAYABLE

Liability under this Policy with respect to any **Occurrence** shall not attach unless and until:

(1) the **Insured's** underlying insurer(s) or the **Insured** shall have paid the greater of the amount of any applicable underlying limits or the applicable retention set forth in Item 2(a) of the Declarations; and

(2) the **Insured's** liability covered hereunder shall have been fixed and rendered certain either by final judgment against the **Insured** after actual trial or by settlement approved in writing by the **Company**, and the **Insured** shall have paid such liability.

Any consideration paid by the **Insured** or the **Insured's** underlying insurers other than in legal currency shall be valued at the lower of cost or market, and any element of the **Insured's** profit or other benefit to the **Insured** shall be deducted in determining the value of such consideration. The **Company** may examine the underlying facts giving rise to a judgment against or settlement by the **Insured** to determine if, and to what extent, the basis for the **Insured's** liability under such judgment or settlement is covered by this Policy.

The **Insured** shall make a definite demand for payment for any amount of the **Ultimate Net Loss** for which the **Company** may be liable under this Policy within twelve (12) months after the **Insured** shall have paid such amount. If any subsequent payments shall be made by the **Insured** on account of the same **Occurrence** or **Claim**, additional demands for payment shall be made similarly from time to time. Such losses shall be due and payable by the **Company** thirty (30) days after they are respectively paid by the **Insured**, demanded and proven in conformity with this Policy.

## AMENDMENT OF ARTICLE VI. CONDITION O. ENDORSEMENT [14]

It is hereby agreed that Article VI. Condition O. is deleted and replaced by the following:

### O. LAW OF CONSTRUCTION AND INTERPRETATION

This Policy, and any dispute, controversy or claim arising out of or relating to this Policy, shall be governed by and construed in accordance with the internal laws of England and Wales, except insofar as:

(1) such laws may prohibit payment in respect of punitive damages hereunder;

(2) the law of another jurisdiction must apply pursuant to any directive of the Council of the European Community relating to non-life insurance

(3) such laws are inconsistent with any provision of this Policy;

provided, however, that the provisions, stipulations, exclusions and conditions of this Policy are to be construed in an even-handed fashion as between the Insured and the Company; without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either the Insured or the Company or reference to the "reasonable expectations" of either thereof or to contra proferentem and without reference to parole or other extrinsic evidence).

*EXHIBIT D*
*TO DECLARATION OF*
*RICHARD F. ALLEN IN SUPPORT*
*OF OSPREY'S MOTION TO DISMISS*

THE HONORABLE JOHN C. COUGHENOUR

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

| PAUL AARON SAVCHENKO, | CASE NO. C11-2081-JCC |
|---|---|
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| ICICLE SEAFOODS, INC. and L.F.K., INC., | |
| Defendant. | |
| ICICLE SEAFOODS, INC. and L.F.K., INC., | |
| Third-party Plaintiffs, | |
| v. | |
| KARI MARIE FISHERIES LLC; and MARK HJELLE, | |
| Third-party Defendants. | |

22    This matter was tried to the Court beginning on October 15, 2013. The claims presented

23  for adjudication were as follows:

24    (1) Is Icicle Seafoods entitled to contribution payments made for any injuries, flare-ups,

25        or aggravations of injury to Paul Savchenko that occurred aboard the F/V KARI

26        MARIE and, if so, what amount?

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 1

1   (2) Was the F/V Karie Marie unseaworthy, and correspondingly liable for any injuries to

2        Paul Savchenko that he sustained or aggravated while on board the F/V KARI

3        MARIE?

4        After bench trial and pursuant to Federal Rule of Civil Procedure 52(a), the Court makes

5   the following findings of fact and conclusions of law:

6   **I.   FINDINGS OF FACT**

7        On September 18, 2010, while working on board the F/V ADVENTURE, Plaintiff Paul

8   Aaron Savchenko ("Savchenko") was injured after he stepped on a board covering a lazarette.

9   The board broke, causing Savchenko to fall approximately eight feet to the bottom of the

10  lazarette, hit a freezer, flip upside down, and land on his head. The faulty board was an "iron

11  bark deck board" that appeared functional from above, but disguised a weakness or defect

12  underneath the board, invisible to Savchenko at the time of the accident. Thus, Icicle failed to

13  ensure that the F/V ADVENTURE was a safe working environment. Savchenko's injury was

14  diagnosed and treated at the Swedish Emergency Center as a rib contusion, back strain, closed

15  head injury, and fall.

16       Just before the injury, Savchenko had been offered a job by the captain of the F/V

17  ADVENTURE, owned by Third-Party Plaintiff Icicle Seafoods ("Icicle"), to work as a seaman

18  aboard the F/V ADVENTURE, as well as complete pre-season repairs on the vessel, as was

19  customary. However, he had not completed the necessary paperwork and been officially hired by

20  Icicle at the time of the injury. Leauri Moore, Director of Human Resources and Risk

21  Management at Icicle Seafoods, Inc., testified that Icicle's decision, immediately after

22  Savchenko's accident, to notify him that he would not be officially hired was not motivated by a

23  desire to avoid the payments they would owe if he were employed by Icicle as a seaman, but

24  rather because he had neglected to mention some previous criminal convictions on his

25  application form.

26       Savchenko experienced both left and right-sided pain after his September 2010 accident

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 2

1 aboard the F/V ADVENTURE, but before his employment aboard the F/V KARI MARIE,

2 owned by Third-Party Defendant KARI MARIE FISHERIES, LLC ("Kari Marie").

3      Between September 10, 2010, and April 4, 2011, Icicle paid Savchenko $6,281.40 in time

4 loss and $8,469.17 in medical benefits. At that time, he was paid under the Longshore and

5 Harbor Workers' Act, rather than as a seaman.

6      Savchenko joined the F/V KARI MARIE on January 15, 2012 as a deckhand. He

7 believed that he had recovered from his September 2010 injury, and told John David Perkins, co-

8 skipper with Dean Gribble of the F/V KARI MARIE at that time, that his back was fine. On

9 January 16, 2012, Savchenko suffered a flare-up of his September 2010 Icicle injury while

10 working on board the F/V KARI MARIE. Specifically, he tweaked his back throwing cod, a task

11 he had performed numerous times before without any problems. Following this flare-up,

12 Savchenko took time off to rest, and was limited to light duty. Once he felt better, he decided to

13 set pots, a task he had performed numerous times before without any problems. However, while

14 engaged in that activity, on February 6, 2012, Savchenko suffered another flare-up of the injury.

15 Finally, Savchenko suffered a third flare-up or aggravation sometime later on, while lifting a

16 heavy object. He did not remember what, specifically, the heavy object was, and could not

17 remember the precise date that this final flare-up occurred. In May 2012, after the final flare-up,

18 Savchenko left the F/V KARI MARIE.

19      Given Savchenko's early injury in September 2010, and the fact that Kari Marie provided

20 light work after his flare-ups or aggravations, Kari Mari was not at fault for any flare-ups

21 suffered during his work on board the F/V KARI MARIE. The F/V Kari Marie was staffed by

22 two skippers and six deckhands, and so was not short-staffed. To the extent Savchenko suffered

23 additional flare-ups or aggravations on board the F/V KARI MARIE, those flare-ups were the

24 consequence of his September 2010 injuries on board the F/V ADVENTURE.

25      In June 2012, after leaving the F/V KARI MARIE, Savchenko returned to work on

26 another vessel, the F/V SKAL, not owned by or affiliated with any party in this litigation.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 3

1  Savchenko returned to work again in July 2012, when he was the captain of the F/V DOUBLE
2  TROUBLE. While Savchenko continued to suffer from back pain on the F/V SKAL, he did not
3  suffer back pain on board the F/V DOUBLE TROUBLE.

4      Savchenko did not submit any medical bills to be paid by Kari Marie. However, Kari
5  Marie paid Savchenko $1,050.00 in maintenance and $17,707.09 in unearned wages for the
6  period between May 7, 2012, the date Savchenko left the F/V KARI MARIE, and June 7, 2013,
7  the date Savchenko returned to work on the F/V SKAL. Savchenko did not seek any further
8  benefits from Kari Marie.

9      Dr. John Burns, Icicle's retained medical expert, testified that Savchenko's injuries were
10 not extremely serious. He said that Savchenko should have fully recovered within four to six
11 weeks following the September 2010 Icicle injury. Additionally, he said that Savchenko should
12 have fully recovered within four to six weeks following any of the injuries allegedly sustained on
13 board the F/V KARI MARIE. Dr. Burns testified that it would not surprise him to learn that
14 Savchenko went back to work after his employment with Kari Marie; he would not find it
15 unusual if Savchenko went back to work in July 2012 and had no pain at that time; and he would
16 not find it unusual if Savchenko was a fisherman in July 2012.

17     The last time Savchenko took medication for his back was in July 2013. He has not seen
18 a doctor or other medical provider since that time. He has no plans to see a medical provider
19 about his back in the future.

20     Icicle paid $29,981.70 in cure or medical benefits to providers for Savchenko, and
21 $18,343.96 in maintenance benefits, for the period between May 2012 to May 2013. In 2013,
22 Icicle settled all of Savchenko's claims against it for the sum of $450,000, including claims for
23 marine personal injury, maintenance and cure, unseaworthiness, and worker's compensation.
24 Kari Marie was not a party to the Global Settlement and Release of All Claims executed by
25 Savchenko, and Savchenko has not released or discharged any of his claims against Kari Marie.
26

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 4

## II.    CONCLUSIONS OF LAW

This Court has jurisdiction over this claim under 46 U.S.C. § 3010, 28 U.S.C. § 1333, and 28 U.S.C. §1367. Original Plaintiff Savchenko filed this maritime and admiralty suit against Icicle seeking damages for personal injuries and maintenance and cure associated with the Septembr 2010 accident. Pursuant to Federal Rule of Civil Procedure 14(a) and this Court's Order, Icicle impleaded Kari Marie as a third-party defendant, asserting that Kari Marie was liable to Savchenko and/or Icicle for new or aggravating injuries Savchenko suffered while employed by Kari Marie as a crab fisherman aboard the F/V KARI MARIE from January to May 2012.

### A. Motion to Exclude Expert Testimony

The Court GRANTS in part Icicle's motion to preclude expert testimony, (Dkt. No. 84), and the testimony of Douglas Lakin and Susan Sorosky is admitted only insofar as it is admissible as testimony by a treating physician. *See Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 824 (9th Cir. 2011).

### B. The Settlement

Icicle is not entitled to contribution from Kari Marie for its settlement with Savchenko because Savchenko has not released his claims against Kari Marie. The Supreme Court has held that, in the admiralty and maritime context, if a single defendant settles with the plaintiff, the plaintiff's recovery from any remaining non-settling defendants is reduced by the settling defendant's proportionate share of fault. *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 209, 217 (1994). Under that rule, Savchenko is entitled to sue Kari Marie for any additional damages, and any recovery he makes will be reduced only by Icicle's proportionate share of fault, and not by the amount of Icicle's settlement. Thus, were Kari Marie partially at fault, and were it to be ordered to contribute to Icicle's settlement with Savchenko, the possibility of a double recovery against Kari Marie would arise if Savchenko subsequently sued Kari Marie.

Both the Eleventh Circuit and the United States District Court for the Northern District of

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 5

1   California have held that, in the admiralty and maritime context, a settling defendant may not sue

2   a non-settling defendant for contribution absent a release of all claims by the plaintiff against the

3   non-settling defendant. *See Murphy v. Florida Keys Elec. Coop. Ass'n*, 329 F.3d 1311, 1318

4   (11th Cir. 2003)("Th[e] . . prohibition against contribution from a settling party does not

5   preclude a contribution suit against a tortfeasor who is released by the settlement even though

6   not a party to it."), *In re Complaint of Taurus Marine, Inc. v. Marin County*, 2012 AMC 317,

7   *13-23, 2012 U.S. Dist. LEXIS 16285 (N.D. Cal. 2012)(discussing the issue in depth).

8   Moreover, the Fifth Circuit has held that where a release of claims against a non-settling

9   defendant is signed, a settling defendant may sue the non-settling defendant for contribution. *See

10  Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 603 (5th Cir.

11  2010)("*AmClyde* does not prevent an action for contribution for a settling tortfeasor who obtains,

12  as part of its settlement agreement with the plaintiff, a full release for all parties."); *see also*

13  *Ondimar Transportes Maritimos v. Beatty St. Props., Inc.*, 555 F.3d 184, 187 (5th Cir.

14  2009)("The Supreme Court's reasoning [in *AmClyde*] also precludes a settling tortfeasor from

15  seeking contribution from a nonsettling tortfeasor."); *Lexington Ins. Co. v. S.H.R.M. Catering*

16  *Servs., Inc.*, 567 F.3d 182, 185 (5th Cir. 2009)(holding that a settling tortfeasor may not sue a

17  nonsettling tortfeasor for contribution in maritime even after the plaintiff assigns its claim to the

18  settling tortfeasor). The Court follows the rule articulated in those cases.

19          The Court has considered Icicle's arguments to the contrary, and finds them meritless. In

20  entering into a settlement with Savchenko that did not release Savchenko's claims against Kari

21  Marie, Icicle extinguished only its own proportionate share of fault, and is not entitled to sue

22  Kari Marie for contribution for any amount paid by Icicle pursuant to that settlement.

23          **C. Negligence, Unseaworthiness, and Liability**

24          Icicle failed to establish by a preponderance of the evidence that the F/V KARI MARIE

25  was unseaworthy or that Kari Marie was negligent, and failed to establish by a preponderance of

26  the evidence that any alleged unseaworthiness or negligence of the F/V KARI MARIE was a

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 6

1 proximate cause of any of Savchenko's alleged injuries or alleged flare-ups of his back.

2      At the time of his injuries aboard the F/V ADVENTURE, on September 18, 2010,

3 Savchenko was serving as a seaman, performing the traditional duties of a seaman. Icicle's

4 negligence and the unseaworthiness of Icicle's vessel, the F/V ADVENTURE, were proximate

5 causes of Savchenko's injuries, including back problems that persisted through and after

6 Savchenko's service aboard the F/V KARI MARIE. Icicle failed to establish that any

7 maintenance and cure payments Icicle made to Savchenko related to an injury Savchenko

8 sustained on board the F/V KARI MARIE. Kari Marie satisfied any obligation it owed to

9 Savchenko with its payments for the period between May 2012 and June 2012.

10      Icicle is not entitled to any contribution for any amount of maintenance and cure it paid

11 Savchenko, as Kari Marie, an innocent vessel owner, is not ultimately responsible for the

12 maintenance and cure obligation incurred because of the fault of Icicle. *See, e.g., Dizard v. Lynn,*

13 1998 AMC 795, 799–800 (W.D. Wash. 1997) ("'[I]t would be wrong to assess damages against

14 a non-negligent or passively negligent shipowner for loss or injuries suffered solely as the result

15 of active negligence of another party.'"(quoting *Tri-State Oil Tool Indus., Inc. v. Delta Marine*

16 *Drilling Co.,* 410 F.2d 178, 186 (5th Cir. 1969))); *Gore v. Clearwater,* 378 F.2d 584, 587 (3d

17 Cir. 1967) ("[W]e conclude that the latter shipowners are entitled to reimbursement in full from

18 the former shipowners which have the primary obligation arising out of negligence and

19 unseaworthiness."); *Mead v. Skip Fisheries, Inc.,* 385 F. Supp. 725, 728 (D. Mass. 1974) ("[T]he

20 second vessel should be indemnified by the first when the disability was due to the actionable

21 fault of the first."); *Gauthier v. Crozby Marine Serv., Inc.,* 499 F. Supp. 295, 300 (E.D. La. 1980)

22 ("I will . . . apportion liability equally between the two ostensibly innocent employers . . . . Of

23 course, if Crozby is later found to be culpable for negligence or unseaworthiness, it will be liable

24 for all of the maintenance and cure attributable to the groin injury.").

25      Savchenko's future medical expenses are not recoverable from Kari Marie because: 1)

26 any amount paid by Icicle to settle Savchenko's future medical expenses is speculative, and is

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 7

1  not reflected in any evidence presented of Icicle's settlement with Savchenko[1]; 2) it is

2  speculative as to what future medical benefits (if any) Savchenko had to incur at the time of the

3  settlement; and 3) the evidence presented fails to prove that Kari Marie caused any problems for

4  which Savchenko would incur future medical expenses.

5       Savchenko's net economic losses are not recoverable from Kari Marie because: 1) the

6  evidence presented fails to establish that Kari Marie was at fault in any way in causing any of

7  Savchenko's alleged injuries; 2) the amount (if any) that Icicle paid to settle fault-based claims is

8  speculative and not reflected in any evidence presented of Icicle's settlement with Savchenko;

9  and 3) the evidence presented fails to prove that any of Savchenko's speculative net economic

10  losses are associated with any of his alleged flare-ups on the F/V KARI MARIE.

11       All remaining claims in this action are dismissed.

12       A judgment consistent with these findings and conclusions will be entered in favor of

13  Third-Party Defendant Kari Marie.

14       SO ORDERED this 31st day of October 2013.

18
19       John C Coghenour

20       John C. Coughenour
21       UNITED STATES DISTRICT JUDGE

25  [1] In other words, Icicle may have had more than one motive for settling, and the
proportion of Icicle's settlement attributable to future medical benefits, rather than (for example)
26  avoiding the threat of a large jury award due to Icicle having withdrawn its employment offer to
Savchenko immediately after his injury, is impossible to determine.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 8

76